TRAVELERS INSURANCE CO., a Connecticut corporation, as Subrogee of Weston J. Donehower, Plaintiff Below, Appellant,

v.

MAGIC CHEF, INC., a Delaware corporation, Johnson Corporation, a foreign corporation, Armstrong Furnace Company, a foreign corporation, Diamond Ice & Fuel Co., a Delaware corporation, and R.W. Beckett Corporation, a foreign corporation, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Jan. 23, 1984.

Decided: July 26, 1984.

Marsha Kramarck of Woloshin & Tenenbaum, P.A., Wilmington, for plaintiff.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendant Johnson Corp.

Rogers Sanders, Wilmington, for defendant R.W. Beckett Corp.

Before McNEILLY, HORSEY and CHRISTIE, JJ.

McNEILLY, Justice:

This appeal arises from a subrogation claim brought in Superior Court by Travelers Insurance Company (Travelers) against Johnson Corporation (Johnson), R.W. Beckett Corp. (Beckett), and Diamond Ice and Fuel Company (Diamond). The claim advanced was grounded in both warranty and negligence. As to breach of warranty, a verdict for Johnson was directed by the Trial Court on the basis of a consequential damages limitation in Johnson's warranty. As to the negligence claim, the Trial Court, after denying plaintiff's request for the application of the doctrine of *res ipsa loquitur* in a pre-trial ruling, permitted the case to go to trial before a jury. The jury returned a verdict awarding the plaintiff $33,364.10, allocating fault between Johnson and Beckett at fifty (50) per cent each. Thereafter, the Trial Court granted Johnson and Beckett's Motion for Judgment Notwithstanding the Verdict (JNOV) based upon the rationale that "the jury was charged with no single theory which would attribute negligence to *both* Johnson and Beckett."

For the reasons set out below, we find that the Trial Court abused its discretion in granting the defendants' Motion for JNOV. Consequently, we reverse the Trial Court's decision and reinstate the jury verdict in favor of the plaintiff.

I

The basic facts giving rise to the matter before the Court are as follows:

Travelers is the subrogee of a claim of Weston J. Donehower, one of its insureds, for soot damage caused by a malfunction of a furnace manufactured by Johnson. The blower motor of the furnace was manufactured by Beckett, and the entire unit installed in the insured's home by Diamond.

Bell's Supply Company, a distributor of such products who purchased the furnace in question from Johnson and in turn sold it to Diamond, was a non-party to the lawsuit.

The furnace was installed in the insured's home on September 27, 1978, prior to the insured leaving on an extended absence from the home. On December 16, 1978, during the insured's absence, the incident giving rise to the claim for soot damage occurred. The evidence indicates that the insured prior to departure had not inspected, adjusted, or otherwise tampered with the furnace or its thermostat.

In its Opinion, the Trial Court found that a myriad of theories regarding causation for the furnace malfunction was presented at trial. These included: (1) misalignment of the furnace burner and combustion chamber, (2) a lack of concentricity of elements of the burner's flame assembly with the flame retention head, and (3) a loose set screw affixing the burner blower fan to an appropriate shaft. The Trial Court further found that the several theories lent themselves to six (6) bases of liability, none of which was capable of permitting the jury to find both Johnson and Beckett negligent.

## II

On appeal to this Court, the plaintiff raises the following arguments in support of its appeal:

1. The decision of the Trial Court in granting defendants' Motion for Judgment Notwithstanding the Verdict was clearly erroneous, and constituted an abuse of discretion as contrary to the evidence.

2. The Court Below erred in refusing to instruct the jury that an unfavorable inference could be drawn from the defendant's failure to produce the subject furnace, or parts thereof, which were in the defendant's control.

3. The Court Below erred in directing a verdict for the defendants on plaintiff's breach of warranty claim on the basis that the plaintiff had not proved the warranty disclaimer was unconscionable.

4. The Court Below erred in refusing to permit the plaintiff to use the doctrine of *res ipsa loquitur* to shift the burden of evidence to the defendants.

As the plaintiff further asserts in regard to the issues, a finding that the Trial Court abused its discretion under Argument I above eliminates the need to consider Arguments II, III, and IV. Thus, we turn first to that contention.

In entertaining the motion for JNOV, the Trial Court was obliged to consider the evidence presented at trial in the light most favorable to the plaintiff, and decide whether under any reasonable view of the evidence, the jury could justifiably find for plaintiff. *Ebersole v. Lowengrub*, Del. Supr., 208 A.2d 495 (1965). *Accord, Parks v. Ziegler*, Del.Supr., 221 A.2d 510 (1966); *Rumble v. Lingo*, Del.Super., 147 A.2d 511 (1958). Before we undertake to determine whether the evidence, and the reasonable inferences drawn therefrom, could support the jury's verdict, we find it necessary to review certain findings made by the Trial Court to ascertain the attitude in which it viewed the evidence.

As noted earlier, the Trial Court found that there were three (3) theories regarding causation which in turn generated six (6) bases of liability. Those six bases were as follows:

1. That the combustion chamber in the furnace and the Beckett burner were misaligned during manufacture or handling (... theory #1 implicating Johnson);

2. That the nozzle of the Beckett burner was not properly aligned with the flame retention head of the Beckett burner (... theory #2 implicating Johnson);

3. That the setting of the flame assembly was improper for normal combustion in a flame retention head burner (... theory #2 implicating Beckett);

4. That the set screw designed to hold the squirrel cage fan on the motor shaft was improperly set when the burner was manufactured (... theory implicating Beckett);

5. Failure to use a flame mirror and a measuring device, such as a Beckett concentricity gauge, which would have permitted detection of defects in the combustion chamber and burner at the time of installation (... theory # 1 implicating Diamond);

6. Failure to check, during installation, the position of the set screw which held the squirrel cage fan on the motor shaft (... theory implicating Diamond).

From this observation, the Trial Court embarked on a detailed analysis of the possible interrelationships of the theories and bases for liability, and went on to conclude that "[c]learly, the verdict ... contradicts the testimony at trial".

While the Trial Court's conclusion could be reasonably drawn based upon its determination of the bases of liability, we disagree with those bases. The Trial Court appears to have been concerned only with the causes of the soot itself, rather than what caused it and, at the same time, permitted it to travel throughout the house. Under that view, we find sufficient evidence in the record to conclude that the concurrent negligence of the two defendants, namely Johnson and Beckett, could have caused the damage.

■ Turning to the record, we first point out that witness Harold Blackburn, who had been a subcontractor of defendant Diamond present during the installation of the insured's furnace, testified on redirect examination as follows:

A Well, see, the burner has to be not operating correctly in order to produce soot, and then something else has to happen in order for the soot to go through the house.

From this, we find that it was within reason for the jury to consider two causes combining to produce the soot problem in issue.*

As to the "burner has to not be operating correctly in order to produce soot" aspect, the witness Blackburn had earlier testified on direct examination as follows:

Q What is a squirrel cage?

A That is actually the part that turbulates the air and creates your oil-air mixture going out and gives you your proper blend of fire.

Q Is it like a fan?

A It is a fan. It is a burner fan.

Q Where does it fit?

A Right on the burner motor itself.

Q So then what did you do after that?

A Okay. Then we proceeded to—I proceeded to take and pick up the nozzle assembly, check that out, make sure it had the right nozzle in it.

\* \* \* \* \* \*

I picked up the burner motor and fan, and I just spun it, and I heard a click. From there I took a reference.

I pulled the pump coupling off the burner motor, and the blower cage actually fits into the pump coupling, and I took an adjustable wrench and held it out on the burner shaft and was able to move the burner fan itself.

Q Now, what does that mean? Assuming we don't know anything about the furnace, what does that mean?

A Okay. What it shows is that there is actually a slowdown of the amount of air going through the burner tube, creating a sooty fire basically.

\* \* \* \* \* \*

---

\* Apparently the Trial Judge was also of this opinion at the time of giving his instructions to the jury since he charged the jury on the possibility of a joint tortfeasor situation. As we indicated, however, the Court probably considered only the possibility of two causes joining to cause the soot itself (as evidenced by the Court's later Opinion) in disregard of the theory that the two causes combined to produce the soot and carry it throughout the house. In any event, the charge was proper.

Q What did you mean when it was clicking? What did that mean to you?

A To me, it was a sign of the burner fan possibly being loose on the burner motor.

\* \* \* \* \* \*

Q If the fan loosens up, what happens then?

A Okay. You have less air going across the fan than what is required to really give you true oil-air mixture. It works basically the same as a carburetor in a car.

Q Assuming we don't know about either of those things and that the fan then is operating more slowly than it should, what happens internally in the—

A Okay. What happens, you got oil spraying into the fire at the same rate that it's previously adjusted to, and when the fan slows down, it actually stops the proper air flow and stops the proper air mix which results in a sooty fire.

\* \* \* \* \* \*

Q Okay. Was there any way for you to determine whether, in fact, that fan was actually operating slower than it should have been?

A Well, the way I determined it was I put the wrench on the burner motor and was able to turn the actual fan on the motor, which shows it was loose; and then after I found that out, I took an Allen wrench and loosened up the eight-inch setscrew the rest of the way to get it off the burner itself, and there was a ringed groove around the motor shaft itself, showing—this showed, to me, that it was slipping on the actual shaft.

From this testimony, the jury could properly conclude that the improperly placed set screw of the squirrel cage fan directly caused the soot which later found its way into the home itself.

■ Now, the question becomes which defendant was negligent in regard to the squirrel cage malfunction. As to Diamond, we find that there was insufficient evidence to show that it was under a duty during installation to either set or check the particular setscrew. In support of this position, witness Blackburn testified on cross-examination to the following:

Q Am I correct that ordinarily, as in the course of normal installation practice, the person who is installing a furnace with this burner in it would not have occasion to check the setscrew, actually put hands on it to see if it was tight, in the absence of some indication either by sound or a bad smoke test. Is that correct?

A On normal installation, you wouldn't have occasion to bother that setscrew unless you do have a problem relating to that—with relating to air adjustment or vibration or a rattle or something similar to this effect.

Q I believe you already testified if there was a problem at the time of installation—

A It would show up.

Q —evidence would show up in a bad smoke test or in some kind of sound which would be detected by the installer. Is that correct?

A Correct.

As to the later testimony in the above reference concerning detection upon installation, it would have been quite reasonable for the jury to have discounted its weight since earlier witness Blackburn had testified as follows:

Q Okay. So that it wasn't—could you tell whether [the loose setscrew] ... maybe just happened the day before?

A That had to take time, take it over a period of time.

Q Is there any way for you to know how long a period of time?

A Not really, because it could happen in a short period of time and it can take a long time. It depends on how much vibration is involved.

It follows that the jury could have concluded that the improperly placed setscrew was secure enough to pass concern during installation, yet not so secure as to hold up

under the demands placed upon it over a longer period of time. The reasonableness of this position is better understood when one considers that the burner fan is secured to the burner motor shaft by the setscrew at a point where the shaft has a flat spot. The testimony indicates that if the setscrew was not sealed in the flat spot but rather on the curved side of the shaft, "vibration and everything will loosen it back up." So viewed, the jury reasonably exonerated Diamond for any liability.

As to defendant Johnson being responsible for the loose setscrew, we find insufficient evidence that it had in any way adjusted it or that they had a duty to check the setting when putting the burner into the whole heating unit.

■ Based on the foregoing, coupled with the fact that there was evidence to conclude that the Beckett burner was delivered to Johnson as a completed product, there is sufficient evidence to show that Beckett was negligent, and this negligence created the soot which entered the insured's home.

Turning to the question of that soot entering the insured's home, we note again the testimony of witness Blackburn. The exchange that follows indicates what he believed to be the probable concurring cause although he earlier stated he was unable to conduct the appropriate tests necessary to decisively determine if in fact that was the cause.

Q If what you found was correct, that the fan was operating far too slowly than it should have been because of the improper setting of the setscrew on the shaft, was that consistent with the amount of soot that was in the house?

A Well, if you coupled that along with [a possible ...] crack in the heat exchanger, yes, it would be very consistent.

■ Although this testimony standing alone is insufficient to show that the heat exchanger was the probable concurring cause due to Blackburn's inability to adequately test the furnace, there is other sufficient evidence showing that there was a problem with this part of the heating unit. Witness Charles Nash, an assistant service manager of Diamond at the time the furnace was installed, testified as follows:

Q And what did you find?

A At that time, we found a series of small pinholes in the weld of the heating exchanger.

Q Is there only one weld in the heat exchanger?

A No, ma'am, there are several welds in the heat exchanger.

Q Did you check all of them?

A Yes, ma'am.

Q Was it your decision, when you found those pinholes, to replace the furnace?

A No, ma'am.

Q Whose decision was it?

A That was really between my service manager and Mr. Donehower himself.

\* \* \* \* \* \*

Q And he said put in a new furnace?

A No, ma'am. He spoke with Mr. Donehower at that particular time.

Q Do you remember if Mr. Donehower said put in a new furnace?

A I don't know what their conversation was because I didn't stand around to listen to it.

Q Okay. Do you remember telling Mr. Donehower that you found the furnace to be faulty?

A Yes, ma'am.

Q And that you found the burner of this type to be faulty?

A No, ma'am.

Q Okay. You don't recall that?

A I did not inform him that we found the burner of—this particular burner to be faulty. I told him that we did have problems with the heat exchanger with the pinholes.

Q Okay. And what did you tell him that you were going to do about that?

A   I didn't tell him I was going to do anything about it.

Q   Did Mr. Donehower first say to you, "Well, then, I demand a new furnace"?

A   I can't say whether it was Mr. Donehower.  I think it was one of the insurance gentlemen who insisted on having a new furnace.

(Note: While witness Nash on cross-examination testified that pinholes occur in 90% of all furnaces and, in this case, they weren't the cause of the damage, we find that the jury could have discounted this later testimony.  First, while 90% of all furnaces may have pinhole leaks, there was no evidence that 90% of all furnaces have a soot problem similar to that encountered here.  Second, as to witness Nash's belief that the pinholes didn't cause the problem throughout the house, the testimony of Blackburn regarding the heat exchanger as a cause of soot going throughout the house as well as the testimony of Nash regarding the decision to replace the furnace was sufficient to rebut the earlier conclusion of Nash).

Overall, we find that there was sufficient evidence presented at trial to permit the jury to return the verdict against Johnson and Beckett, which impliedly found no liability on Diamond's part.  The evidence taken as a whole is supportive of a finding of liability on Beckett's part for the improperly placed setscrew causing the soot; and, in conjunction therewith, on the part of Johnson for the pinhole leaks in the heat exchanger which caused the soot to travel throughout the home.

Viewing the evidence in the light most favorable to plaintiff, we conclude that the jury's verdict was the result of a logical deductive process.  Accordingly, we find that the Trial Court abused its discretion in granting the defendant's Motion for JNOV. Having so found, we see no need to address Arguments II, III, or IV set out *supra,* or the legal contention asserted by plaintiff under Argument I concerning alternative liability.

\*     \*     \*

REVERSED.