# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| MRPC CHRISTIANA LLC, et al., | ) |
| | ) |
| | ) C.A. No. N15C-02-010 EMD |
| Plaintiffs/Counterclaim Defendants , | ) |
| | ) |
| v. | ) |
| | ) |
| CROWN BANK, | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |
| | ) |

## DECISION AFTER TRIAL

John G. Harris, Esq., Michael W. McDermott, Esq., and David B. Anthony, Esq., Berger Harris LLP, Wilmington, Delaware. *Attorneys for Plaintiffs/Counterclaim Defendants MRPC Christiana LLC, Krishnas, LLC, BWI MRPC Hotels, LLC, Paresh Patel, Ranjan Patel, Chirag Patel and Paresh Patel and Ranjan Patel Irrevocable Trust.*

Daniel A. Griffith, Esq., Chad J. Toms, Esq., and Kaan Ekiner, Esq., Whiteford, Taylor & Preston, LLC. *Attorneys for Crown Bank.*

## I. INTRODUCTION

This is a commercial civil action. The action arises out of a $12,988,000.00 construction loan (the "Loan") by and between Crown Bank ("Crown"), MRPC Christiana, LLC ("MRPC"). The Loan is secured by various guarantees and collateral, including the primary collateral which is a hotel located at 56 South Old Baltimore Pike, Parcel Numbers 09-035.00-019 and 09-035.00-12, Newark Delaware (the "Hotel").

The complaint (the "Complaint") initiating this civil action was filed on January 31, 2015. The named Plaintiffs were MRPC, Krishnas, LLC ("Krishnas"), Ganesa, LLC ("Ganesa"), BWI MRPC Hotels, LLC ("BWI"), Paresh Patel ("Mr. P. Patel"), Ranjan Patel ("Ms. R. Patel"), Chirag Patel ("Mr. C. Patel"), and Ranjan Patel Irrevocable Trust (the "Trust", and collectively with other Plaintiffs, the "Plaintiffs"). The Complaint set forth five (5) causes of action against Crown: (i) Count I – Negligence; (ii) Count II – Breach of Contract; (iii) Count III –Breach of

Covenant of Good Faith and Fair Dealing; (iv) Count IV – Tortious Interference with Contract; and (v) Count V – Unjust Enrichment.

On February 25, 2015, Crown filed an Answer to the Complaint. The Answer also asserted twenty-one counterclaims (the "Counterclaims") , which sets forth 21 counts for affirmative relief: (i) Count I – Money Damages – Note #1 (Permanent Note); (ii) Count II – Money Damages – Note #2 (Interim Note); (iii) Count III – Money Damages - Chirag Guaranty #1; (iv) Count IV – Money Damages - Chirag Guaranty #2; (v) Count V – Money Damages - The Trust Guaranty #1; (vi) Count VI – Money Damages - The Trust Guaranty #2; (vii) Count VII – Money Damages - Krishnas Guaranty #1; (viii) Count VIII – Money Damages - Krishnas Guaranty #2; (ix) Count IX – Money Damages - Ganesa Guaranty #1; (x) Count X – Money Damages - Ganesa Guaranty #2; (xi) Count XI – Money Damages - BWI Guaranty #1; (xii) Count XII – Money Damages - BWI Guaranty #2; (xiii) Count XIII – Money Damages - Paresh Guaranty #1; (xiv) Count XIV – Money Damages - Paresh Guaranty #2; (xv) Count XV – Money Damages - Ranjan Guaranty #1; (xvi) Count XVI – Money Damages - Ranjan Guaranty #2; (xvii) Count XVII – Judgment in Possession – Security Agreement #1; (xviii) Count XVIII – Judgment in Possession – Security Agreement #2; (xix) Count XIX –In Rem Levy on Hotel Property; (xx) Count XX – In Rem Levy on Second Hotel Property; and (xxi) Count XXI – In Rem Levy on the Hockessin Property. Counterclaims I through XVI, that seek *in personam* remedies, and Counterclaims XVII through XXI seek in rem relief. On March 23, 2015, Plaintiffs filed their Answer to the Counterclaims.

On July 28, 2015, Plaintiffs filed a Motion for Administrative Consolidation (the "Consolidation Motion"), seeking to consolidate, under Superior Court Civil Rule 42(a), seven (7) separate matters pending in the Delaware Superior Court.

On March 16, 2016, the Court entered the Amended Trial Scheduling Order (the "Amended Trial Scheduling Order"), setting forth a trial date of August 1, 2016. [D.I. 62].

On May 20, 2016, Crown filed a Motion to Strike Jury Demand. On June 20, 2016, the Court granted Crown's Motion to Strike Jury Demand.

On June 7, 2016, Crown filed four motions for partial summary judgment (the "Partial Summary Judgment Motions"). The Partial Summary Judgement Motions sought relief under Civil Rule 5 on Plaintiffs' Count I, Count IV and Count V. One of the Partial Summary Judgement Motions moved for judgement on all of Plaintiffs' breach of contract claims. On June 27, 2016, Plaintiffs filed their Responses in Opposition to the Partial Summary Judgment Motions.

On June 29, 2016, Plaintiffs filed a Motion for Leave to File an Amended Complaint. On July 5, 2016, Crown filed a Response in Opposition to Plaintiffs' Motion for Leave to File an Amended Complaint.

The Court held a hearing on the Partial Summary Judgment Motions on July 11, 2016. During the hearing, Plaintiffs withdrew their opposition to the Partial Summary Judgment Motions as to Counts I and V. On July 20, 2016, the Court granted Crown's Partial Motion for Summary Judgment as to Count IV. The Court also denied Crown's Motion for Partial Summary Judgment as to all breach of contract claims, holding that there were genuine questions as to material facts. Accordingly, the Plaintiffs' only remaining claims were Count II for Breach of Contract and Count III for Breach of the Covenant of Good Faith and Fair Dealing.

At the hearing, the Court also granted in part and denied in part Plaintiffs' Motion for Leave to File an Amended Complaint. On July 25, 2016, Plaintiffs filed the First Amended Complaint. On July 27, 2016, Crown filed its Answer to the First Amended Complaint.

3

On July 22, 2016, the pretrial conference was held before the Court. After the pretrial conference, the Court entered the joint proposed pretrial stipulation and order (the "Pretrial Stipulation").

## II. THE TRIAL

A bench trial on Plaintiffs' Counts II and III and Crown's Counterclaims was held on the following dates: August 1, 2016 through August 5, 2016; September 21, 2016 through September 23, 2016; October 21, 2016; November 7, 2016; and January 6, 2017 (collectively, the "Trial").[1] The Court then had both parties submit their closing arguments in written form, receiving the final post-trial paper on or about June 16, 2017.[2]

### A. WITNESSES

During the Trial, the Court heard from and considered testimony from the following witnesses:

Chirag P. Patel
Paresh Patel
Daniel Lesser
Thomas Deignan
Kevin Friedrich
John Burgess
Peggy Lane
Lawrence Kneip
Anthony Mirandi
Jacinto Rodrigues
Warren Feldman
William Santora
Brian Casey
Keith Madigan

---

[1] Super. Ct. R. Civ. P. 39(b)

[2] Although in all the Briefing Orders, the parties did not submit word versions of their post-trial briefs until after the Court made a request late in September 2017.

All the witnesses testified on direct and were available for cross-examination. The fact witnesses in this civil action were Mr. C. Patel, Mr. P. Patel, Mr. Deignan, Mr. Friedrich, Mr. Burgess, Ms. Lane, Mr. Kneip, Mr. Mirandi, and Mr. Rodrigues. The expert witnesses were Mr. Lesser, Mr. Feldman, Mr. Madigan, Mr. Casey and Mr. Santora. Normally, the Court would list the witnesses in the order they testified and which party called the witness; however, because the Trial was a bench trial, the Court took witnesses out of order and used Rule 611 of the Delaware Rules of Evidence to allow for examination of the witness for both parties cases-in-chief.

## B. EXHIBITS

The parties submitted an extensive number of exhibits. Most of these exhibits were admitted without objection. The parties provided the Court with the exhibits in the form of joint exhibits ("JX").

## III. APPLICABLE LAW

The Court will be applying the following general legal principles:

### A. GOVERNING SUBSTANTIVE LAW

The Agreement provides that New Jersey law applies to the substantive issues relating to governance, construction and interpretation.[3]

### B. STANDARD OF LAW FOR BREACH OF CONTRACT

In New Jersey, a party must allege three elements to state a breach of contract claim: "(1) a valid contract, (2) breach of that contract, and (3) damages resulting from that breach."[4] If the terms of a contract are clear, "it is the function of a court to enforce it as written and not to make a better contract for either of the parties."[5] Absent ambiguity, the intention of the parties is to be

---

[3] JX84 at Art. 8, sec. 8.1(h) ("This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New Jersey.").
[4] *EnviroFinance Group, LLC v. Environmental Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. Super. App. Div. 2015).
[5] *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720-21 (N.J. 1960).

ascertained by the language of the contract.[6]  If the language is plain and capable of legal

construction, the language alone must determine the agreement's force and effect.[7]

One of the elements that the party must prove is the other party's breach of the contract.[8]

Failure to perform a contract in accordance with its terms and conditions constitutes a breach of

contract.  It does not matter if the failure to perform was purposeful or inadvertent.

### C. MATERIAL BREACH

A breach may be material or minor.  If a breach "goes to the essence of the contract,"

then the breach is material.[9]  The New Jersey Supreme Court adopted Section 241 of the

Restatement (Second) of Contracts to determine if a breach is material.[10]  The Court must

consider:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonably assurances; and

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[11]

---

[6] *Dontzin v. Myer*, 694 A.2d 264, 267 (N.J. Super. App. Div. 1997).
[7] *Royal Ins. Co. v. Rutgers Casualty Ins. Co.*, 638 A.2d 924, 927 (N.J. Super. App. Div. 1994).
[8] Taken from New Jersey Model Jury Charge (Civil) 4.10 "Bilateral Contracts" (May 1998); New Jersey Model Jury Charge (Civil)  4.10 L "Claims of Breach" (May 1998).
[9] *Roach v. BM Motoring, LLC*, 155 A.3d 985, 991 (N.J. 2017) (citing *Ross Sys. v. Linden Dari-Delite, Inc.*, 173 A.2d 258 (N.J. 1961)).
[10] *Id.* at 991-92.
[11] *Id.* (quoting *Restatement (Second) of Contracts*, § 237 (1981)).

6

Whether conduct is a breach of contract or a material breach of contract is ordinarily a question for the trier of fact.[12]

If a party materially breaches the contract, the other party may treat the contract as void or proceed on the contract.[13] If the non-breaching party continues to perform on the contract, then the contract remains valid.[14] The non-breaching party's indication that it intends "to perform will operate as a conclusive choice, not in deed depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part."[15]

### D. MODIFICATION OF A CONTRACT

Parties can show modifications to contracts through explicit agreements to modify or actions and conduct of the parties, but "the intention to modify [must be] mutual and clear."[16] "Ambiguous course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed, will not support modification."[17] Further, modification of a contract requires new or additional consideration.[18]

### E. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING[19]

In addition to the express terms of a contract, the law provides that every contract contains an implied covenant of good faith and fair dealing. This means that, even though not specifically stated in the contract, it is implied or understood that each party to the contract must

---

[12] *Magnet Resources, Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 982 (N.J. Super. App. Div. 1998).
[13] *Merchants Indem. Corp. v. Eggleston*, 179 A.2d 505, 513 (N.J. 1962).
[14] *Id; see also Frank Stamato & Co. v. Borough of Lodi*, 71 A.2d 336, 339 (N.J. 1950).
[15] *Twin Crest Group v. Del. Valley Urology, LLC*, 2013 WL 6508241, at *8 (D.N.J. Dec. 12, 2013) (quoting *Frank Stamato*, 71 A.2d at 339).
[16] *County of Morris v. Fauver*, 707 A.2d 958, 967 (N.J.1998).
[17] *Id.* (quoting 17A C.J.S. Contracts § 375 (1963)) (international quotations omitted).
[18] *Segal v. Lynch*, 48 A.3d 328, 342 (N.J. 2012) (citing *County Of Morris*, 707 A.2d at 967).
[19] Taken from New Jersey Model Jury Charge (Civil) 4.10 "Bilateral Contracts" (February 2011); New Jersey Model Jury Charge (Civil) 4.10 J "Implied Terms—Covenant of Good Faith and Fair Dealing" (February 2011).

act in good faith and deal fairly with the other party in performing or enforcing the terms of the contract.[20]

To act in good faith and deal fairly, a party must act in a way that is honest and faithful to the agreed purposes of the contract and consistent with the reasonable expectations of the parties. A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

There can be no breach of the implied covenant of good faith and fair dealing unless the parties have a contract.[21]  Additionally, the implied covenant of good faith and fair dealing may not override an expressly granted right under the contract.[22]

In order for there to be a breach of the implied covenant of good faith and fair dealing in this case, a party must demonstrate that the other contracting party, with no legitimate purpose: 1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and 2) by such conduct, denied the party of the bargain initially intended by the parties.[23]  In considering what constitutes bad faith, a number of factors can be considered, including the expectations of the parties and the purposes for which the contract was made.  The fact finder should also consider the level of sophistication between the parties, whether the

---

[20] *See Sons of Thunder, Inc. v. Borden, Inc*., 690 A.2d 575 (N.J. 1997); *Pickett v. Lloyd's*, 131 *N.J.* 457, 467 (N.J. 1993); *Onderdonk v. Presbyterian Homes,* 425 A.2d 1057, 1062 (N.J. 1981); *Bak-A-Lum Corp. v. Alcoa Bldg. Prods. Inc*., 351 A.2d 349, 352-53 (N.J. 1976); *Ass'n Group Life, Inc. v. Catholic War Veterans*, 293 A.2d 382, 383 (N.J. 1972); *Palisades Properties, Inc. v. Brunetti,* 207 A.2d 522, 531 (N.J. 1965).

[21] *Wade v. Kessler Institute,* 798 A.2d 1251, 1262 (N.J. 2002) (expressly emphasizing there can be no breach of the implied covenant of good faith and fair dealing in the absence of a contract).

[22] *Id.*

[23] *See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc.*, 864 A.2d 387, 396 (N.J. 2005) (clarifying the proof standards for a breach of good faith and fair dealing claim stating that: (i) "Proof of 'bad motive or intention' is vital to an action for breach of the covenant….;"  (ii) the party claiming a breach "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.").

parties had equal or unequal bargaining power, and whether the party's act involved the exercise of discretion.

The fact finder must keep in mind, however, that bad faith is not established by simply showing that a party's motive for the actions did not consider the best interests of the other party. New Jersey contract law does not require parties to behave thoughtfully, charitably or unselfishly toward each other.[24]

In order for a party to prevail on a breach of implied covenant of good faith and fair dealing, the fact finder must specifically find that bad faith motivated a party's actions. A party who acts in good faith on an honest, but mistaken, belief that the actions were justified has not breached the covenant of good faith and fair dealing.[25]

F.  **LEGAL STANDARD FOR GUARANTEES**

When resolving questions as to the interpretation of contracts of guarantee, New Jersey courts look to the rules governing construction of contracts generally.[26] The terms of a guarantee agreement must be read in light of commercial reality and in accordance with the reasonable expectations of persons in the business community involved in transactions of the type involved.[27]

G.  **GENERAL DAMAGES – BREACH OF CONTRACT[28]**

A plaintiff who is awarded a verdict for breach of contract is entitled to compensatory damages for such losses as may fairly be considered to have arisen naturally from the

---

[24] *Wilson v. Amerada Hess Corp.,* 773 A.2d 1121, 1130  (N.J. 2001).

[25] *Silvestri v. Optus Software, Inc.,* 814 A.2d 602 (N.J. 2003).

[26] *Center 48 Ltd. P'ship v. May Dept. Stores Co.*, 810 A.2d 610, 618-19 (N.J. Super. App. Div. 2002) (citing *Garfield Trust Co. v. Teichmann*, 95 A.2d 18, 21-22 (N.J. Super. App. Div. 1953)).

[27] *Center 48 Ltd. P'ship,* 810 A.2d at 819 (citing *Mt. Holly State Bank v. Mt. Holly Washington Hotel, Inc.*, 532 A.2d 1125, 1127-28 (N.J. Super. App. Div. 1987)).

[28] Taken from New Jersey Modern Jury Charge (Civil) 8.45 (December 2014); *see also Donovan v. Bachstadt,* 453 A.2d 160 (N.J. 1982); *525 Main Street Corp. v. Eagle Roofing Co.*, 168 A.2d 33 (N.J. 1961); *Coyle v. Englander's,* 488 A.2d 1083 (N.J. Super. App. Div. 1985).

defendant's breach of contract.  Alternatively, a party may be entitled to such damages as may reasonably be supposed to have been contemplated by both parties, at the time they made the contract, as the probable result of the breach of such contract.

Compensatory damages for breach of contract are designed under the law to place the injured party in as good a monetary position as he/she would have enjoyed if the contract had been performed as promised.  What that position is depends upon what the parties reasonably expected at the time they made the contract.  A party is not liable for a loss that the parties did not have reason to foresee as a probable result of any breach.  While the loss must be a reasonably certain consequence of the breach, the exact amount of the loss need not be certain.

### H. BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE[29]

In a civil case, the burden of proof is by a preponderance of the evidence.  Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not.  Preponderance of the evidence does not depend on the number of witnesses.  If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and the Court must find against the party on that point.

In deciding whether any fact has been proved by a preponderance of the evidence, the Court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this particular case: (i) MRPC must prove all the elements of Count II for Breach of Contract and Count III for Breach of the Covenant of Good Faith and Fair Dealing by a

---

[29] Taken from Superior Court Civil Pattern Jury Instruction 4.1.

10

preponderance of the evidence; and (ii) Crown must prove all the elements of the Counterclaims by a preponderance of the evidence.[30]

### I. EVIDENCE—DIRECT OR CIRCUMSTANTIAL[31]

Generally speaking, there are two types of evidence from which a jury may properly find the facts. One is direct evidence—such as the testimony of an eyewitness. The other is indirect or circumstantial evidence—circumstances pointing to certain facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that the Court find the facts from all the evidence in the case: both direct and circumstantial.

### J. EVIDENCE EQUALLY BALANCED[32]

If the evidence tends equally to suggest two inconsistent views, neither has been established. That is, where the evidence shows that one or two things may have caused the event (*e.g.*, a material breach): one for which MRPC was responsible and one for which Crown was not. The Court cannot find for MRPC if it is just as likely that the event was caused by one thing as by the other.

In other words, if the Court finds that the evidence suggests, on the one hand, that Crown committed a breach, but on the other hand, that Crown did not commit a breach, then the Court must not speculate about the suggested causes of MRPC's injury; in that circumstance the Court must find for Crown.[33]

---

[30] *See, e.g., Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967)(defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984)(same).
[31] Taken from Superior Court Civil Pattern Jury Instruction 23.1.
[32] Taken from Superior Court Civil Pattern Jury Instruction 4.3.
[33] *See, e.g., Eskridge v. Voshell*, 593 A.2d 589 (table), 1991 WL 78471, *3 (Del. 1991).

11

**K.    MULTIPLE PARTIES[34]**

The Court notes that there are several parties in this case with claims and counterclaims. Some may be liable while others are not. The Court will engage in a fair consideration of all of the parties' arguments and defenses. If the Court finds against one party, that shouldn't affect the Court's consideration of other parties.[35]

**L.  CREDIBILITY OF WITNESSES—WEIGHING CONFLICTING TESTIMONY[36]**

Here, the Court is the sole judge of each witness's credibility. That includes the parties. The Court considers each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If the Court finds the testimony to be contradictory, the Court may try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if the Court cannot do this, then it is the Court's duty and privilege to believe the testimony that, in the Court's judgment, is most believable and disregard any testimony that, in the Court's judgment, is not believable.

**M.  PRIOR SWORN STATEMENTS[37]**

If the Court finds that a witness made an earlier sworn statement that conflicts with witness's trial testimony, the Court may consider that contradiction in deciding how much of the trial testimony, if any, to believe. The Court may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an

---

[34] Taken from Superior Court Civil Pattern Jury Instruction 5.5.
[35] *See Travelers Ins. Co. v. Magic Chef, Inc.*, 483 A.2d 1115 (Del. Super. 1984)
[36] Taken from Superior Court Civil Pattern Jury Instruction 23.9.
[37] Taken from Superior Court Civil Pattern Jury Instruction 23.2.

12

important fact or a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation made sense to the Court.

The Court's duty is to decide, based on all the evidence and the Court's own good judgment, whether the earlier statement was inconsistent; and if so, how much weight to give to the inconsistent statement in deciding whether to believe the earlier statement or the witness's trial testimony.

### N.  PRIOR INCONSISTENT STATEMENT BY WITNESS[38]

A witness may be discredited by evidence contradicting what that witness said, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, that is inconsistent with the witness's present testimony.

The Court, as the fact finder, will determine whether a witness has been discredited, and if so, to give the testimony of that witness whatever weight that the Court think it deserves.

### O.  EXPERT TESTIMONY[39]

The parties presented expert witnesses during the course of the Trial.  Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, the Court may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors previously mentioned for weighing the testimony of any other witness.  Expert testimony should receive whatever weight and credit the Court thinks appropriate, given all the other evidence in the case.

---

[38] Taken from Superior Court Civil Pattern Jury Instruction 23.3
[39] Taken from Superior Court Civil Pattern Jury Instruction 23.10.

## IV.  DISCUSSION

The Court heard from a number of witnesses—both fact and expert.  Before detailing the findings of fact and conclusions of law, the Court is going to address the credibility and effectiveness of the witnesses.

### A.  CREDIBILITY OF WITNESSES

Here, the Court is the sole judge of each witness's credibility, including the parties.  The Court finds that—based on their testimony at the Trial, their manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony—Mr. P. Patel, Mr. Deignan, Mr. Kneip and Mr. Mirandi were very credible witnesses.  The Court noted that Mr. P. Patel, Mr. Deignan, Mr. Kneip and Mr. Mirandi were responsive to the questions asked even when the question was difficult and may have solicited information that did not support the position espoused by the party they supported.  The Court also finds that Mr. Kneip, Mr. Deignan and Mr. Mirandi provided testimony that was helpful to the Court on the issues to be decided in this civil action.

The Court did not find the testimony of Mr. C. Patel to be overly credible or helpful.  Mr. C. Patel was not always responsive to the questions asked by the lawyers or the Court.  In fact, the Court cautioned Mr. C. Patel during the Trial that he needed to respond the questions that were asked.  Moreover, some of the testimony of Mr. C. Patel seemed contrary to the evidence adduced at the Trial and the plain language of controlling documents.  Mr. C. Patel's testimony surrounding the use of the $1,500,000 cash collateral held in an account at Crown on or about December 8, 2014 is just one example of why the Court finds Mr. Patel not to be a credible witness.  JX649; TT:8/2, 51:13-84:10; TT:8/3 147:10-149:15.

14

The Court finds that some of the testimony of Mr. Rodrigues was credible and/or helpful. Mr. Rodrigues was not as responsive as he could be and that made it difficult to follow some of his responses. To the Court, Mr. Rodrigues seemed to be "trying to hard" to present the position of Crown as opposed to responding to the question. Because of this, the Court discounted some of Mr. Rodrigues' testimony.

Mr. C. Patel and Mr. Rodrigues were the representatives at trial of MRPC and Crown respectively. As such, Mr. C. Patel and Mr. Rodrigues have a strong interest in the outcome of this civil action, *i.e.*, bias. This showed through unreasonable testimony, inconsistency of testimony, convenient memory failure and their demeanor on the stand.

The Court finds the remaining witnesses—Mr. Lesser, Mr. Friedrich, Mr. Burgess, Ms. Lane, Mr. Feldman, Mr. Santora, Mr. Casey and Mr. Madigan—to be credible witnesses.

## B. FINDINGS OF FACT

### 1. The Parties

MRPC is a Delaware limited liability company, maintaining its principal place of business at 56 S. Old Baltimore Pike, Newark, Delaware. JX726 at 3, Ans. No. 3. MPRC is the owner of the primary collateral in this litigation—the Hotel.

MRPC made a decision to expand and re-flag the Hotel as a Sheraton Four Points Hotel "towards the end of 2010, beginning of 2011." TT:8/1, 27:9-28:1. Sheraton Four Points is part of the Starwood Hotel conglomerate. TT:8/1, 25:16-18.

Crown is a New Jersey chartered bank. Crown's principal place of business is located at 27 Prince Street, Elizabeth Union County, New Jersey, 07276. JX84.

Mr. P. Patel and Ms. R. Patel are husband and wife residing at of 181 Thompson Drive, Hockessin, Delaware. JX726 at 3-4, Ans. Nos. 9, 10. Mr. C. Patel is an individual residing at

15

the same address.  Mr. C. Patel is the manager of MRPC.  TT:8/1, 23:23-24:7; 26:14-23.  The residence of Mr. P. Patel and Ms. R. Patel (the "Patel Residence") is secondary collateral for the Loan.  TT:8/1, 76:11-77:5.

The Trust is a Delaware trust formed with an address location of 181 Thompson Drive, Hockessin, Delaware.  Mr. P. Patel and Ms. R. Patel are the grantors and beneficiaries of the Trust.  JX726 at 3, Ans. No. 5.  The Trust is a member of MRPC.  TT:8/1, 74:2-12.  Mr. C. Patel is the sole trustee of the Trust.  TT:8/1, 30:5-8.

Krishnas is a Delaware limited liability company with a business address of 1024 Churchmans Road in Newark, Delaware.  Krishnas owns and operates the Country Inn and Suites located at 1024 Old Churchmans Road, Newark DE, 19713 ("The Country Inn Hotel").  JX726 at 3, Ans. No. 6; TT:8/2, 160:19-161:2.  The Country Inn Hotel is also collateral for the Loan.  TT:8/1, 76:11-77:5.  Mr. C. Patel is Krishnas' manager.  JX94 at 4.

BWI is a Maryland limited liability company with a Delaware address location of 181 Thompson Drive, Hockessin, Delaware.  JX726 at 3, Ans. No. 7.  Mr. P. Patel is BWI's managing member.  JX100 at 4.  On December 19, 2012, BWI owned an undeveloped parcel of land located at 1200 Old Elkridge Landing Road, Linthicum, Maryland (the "Maryland Parcel").  TT:8/2, 175:9-17.  Crown already foreclosed on the Maryland Parcel.  TT:8/2, 154:9-155:5.

Ganesa is a Delaware limited liability company with an address location of 181 Thompson Drive, Hockessin, Delaware.  JX726 at 3, Ans. No. 8.  Ganesa owns an undeveloped parcel of land located at 630 South Pennsville Auburn Road, Carneys Point, Salem County, New Jersey (the "New Jersey Parcel").  TT:8/2, 163:21-164:4.  Mr. C. Patel is Ganesa's manager.  JX109 at 4.

16

## 2. The Hotel and Decision to Renovate and Reflag

In 1991, Mr. P. Patel purchased the unimproved real property located at 56 S. Old Baltimore Pike, Newark, Delaware (the "Property"). TT: 8/1, 22:19-22. In 1996-97, Mr. P. Patel developed the Property into a 65-unit Comfort Suites hotel, defined here as the Hotel. *Id*. at 100:13-14. In the years that followed, Mr. P. Patel's son, Mr. C. Patel, worked at the Hotel in virtually every facet of its business operations. *Id*. at 114:18-19; 145: 14-16; 23:13-22.

In 2011, MRPC closed the Hotel so that it could be renovated and reflagged. JX779 at 3; TT: 8/1, 65:7-9. At about the same time, Mr. C. Patel, on behalf of MRPC, engaged DelVal Financial Business Corp. ("DelVal") for the purpose of originating, underwriting, processing, and servicing the SBA component of the financing needed for rebranding and renovating the Property. TT: 8/1, 46:14-21; 8/1 104:6-8; 8/1 118:3-14.

MRPC weighed two renovation and rebranding scenarios. One option was to renovate the existing 65-room hotel and rebrand it as La Quinta Inn and Suites ("La Quinta"), which would require $400,000 of financing. TT: 8/1, 31:9-32:3; 8/1 46:17-21. MRPC had lined-up funds to refinance existing debt for the La Quinta option through Evolve Bank and Trust. 8/1 44:5-15; 102:7-10; JX779 at 134. The second option was to renovate, expand, and rebrand the Hotel as a Four Points by Sheraton, which entailed adding three floors to the Property.

In 2012, MRPC commissioned a report from HVS, a hotel consulting firm, to evaluate both renovation options. TT: 10/21, 97:12; JX6; JX779. MRPC ultimately decided to move forward with the Four Points option (the "Project"). TT: 8/1, 33:1-20. MRPC negotiated the PIP, procured new furniture, fixtures and equipment ("FF&E") and obtained the necessary building permit for the Project from New Castle County. JX073.

17

MRPC sought out a lending source for the additional financing needed to complete the Project. In or around early March of 2012, a financing agent, CLC Lending, introduced MRPC to Crown. TT: 8/1, 47:16-23. The parties entered into a Letter of Intent on or about March 5, 2012, which required that MRPC pay Crown a fee of approximately $20,000. TT: 8/1 49:2-4; JX785.

### 3. The Loan Commitment, as Modified

MRPC and Crown entered into a loan commitment letter dated May 31, 2012 (the "Loan Commitment"), outlining the terms and conditions of Crown's commitment to lend nearly $13 million to MRPC through a construction loan and a bridge loan. JX23. Senior Vice President and SBA Director, Mr. Kneip, signed the Loan Commitment for Crown, and Mr. C. Patel signed the document for MRPC. JX23. MRPC paid Crown $95,082.00 to obtain the Loan Commitment. JX23.

The Loan Commitment, among other things, provides:

- the term of the Loan was to be 12 months from closing (p. 2);

- a list of "Collateral Security" (p. 3-4);

- an entity entitled Tetra Tec was to provide a performance Bond, complete a plan and cost review to determine acceptability prior to closing and conduct site inspections and review all draw requests. Crown was to review and approve the plan and cost review prior to closing. (p. 4);

- Crown Bank would not make the Loan with the SBA 504 Lender issuing a commitment to refinance the Bridge Loan (p. 6).

Exhibit A to the Loan Commitment provides for the use of the Loan proceeds (the "Sources and Uses"). The Sources and Uses were reviewed and approved by Crown, MRPC and DelVal before the Loan closed. JX23; JX82. Mr. Kneip presented the Sources and Uses to Crown's Board Loan Committee ("BLC"), which approved them without modification. JX22 at

18

4. The Sources and Uses were also provided to HVS, who used them in determining the feasibility and expected profit of the Project. JX779 at 39.

Exhibit E to the Loan Commitment is entitled "Construction Addendum." JX23 at Exhibit E. The Construction Addendum provides a lengthy list of "Required documentation for construction disbursement." JX23 at 1-2. Exhibit E also provides that:

> Disbursements will occur within five business days of the receipt of a satisfactory CONSTRUCTION MANAGER. Retainage of 10% for each advance will be withheld. This retainage will be released when the construction management company signs off on the project, the borrower accepts the project, final lien waivers have been received and the permanent certificate of occupancy has been issued and confirmed.

JX23 at 2. While Tetra Tec is mentioned in the Loan Commitment, Tetra Tec is not defined as or designated as the "Construction Manager" anywhere in the Loan Commitment.

The Court finds that the evidence at Trial indicates that, with respect to the Loan, the "CONSTRUCTION MANAGER" means a process beginning with Mr. Mirandi's inspection report as submitted to and reviewed by Crown, *see, e.g.*, JX212 and JX221, and JX228 and JX237, and ending in a Construction Loan Advance Authorization Sheet. *See, e.g.*, JX301 (prepared by Vanessa Fernandes, verified by Ms. Ross, signed by Mr. Kniep and officer approved by John Young). The Court does not find that Mr. Rodrigues explanation was very credible on this point. Instead, the Court finds the wording of Exhibit "E" and testimony from Ms. Lane and Mr. Kneip demonstrates that more than Mr. Mirandi's site inspection would be necessary for disbursement. JX23 at 18-19. For example, the CONSTRUCTION MANAGER includes "review of retainage status," "verify disbursement math," "review…lien waivers." JX23 at 18-19.

The Court, as fact finder, used the word "indicates" because the Court does not believe either party fully demonstrated or proved by a preponderance of the evidence what was meant by

CONSTRUCTION MANAGER. Crown drafted the term and the ambiguity rests with Crown. In any event, the evidence adduced at the Trial provides that Crown did not always make a disbursement within five (5) business days after: (i) Mr. Mirandi submitted an inspection report; or (ii) Construction Loan Advance Authorization Sheet had been executed by all necessary parties.

The parities modified the Loan Commitment after May 31, 2012. On August 9, 2012, the parties modified the Loan Commitment to extend the expiration date to November 30, 2012. JX47. In addition, the parties modified the Loan Commitment on December 9, 2012 to extend the expiration date to December 31, 2012 (the "December LC Modification"). JX72.

The December LC Modification required that Mr. P. Patel and Ms. R. Patel put up their personal residence as collateral for the Loan. TT: 1/6, 148:12-19; JX47; JXE 72. The December LC Modification also removed Tetra Tec. JX47. The December LC Modification, in part, provides:

> Tetra Tec was originally approved to complete a plan and cost review, review draw requests and perform site inspections, and to provide a performance bond. The Bank will engage its own construction consultant and Tetra Tec will not be used. The Borrower also obtained a performance bond separately, which must be approved by the Bank prior to closing. The hard cost budget will be adjusted and $50,000 will be funded from the hard cost contingency line item to cover the $59,000 bond cost and $11,000 budget and draw request review fee being charged.

JX47; JX72.

MRPC was to obtain the performance bond. JX72 at 2; JX182 at Attachment C (letter from Liberty Mutual Surety). Crown was to fund $50,000. Crown funded the $50,000 for the performance bond at closing but it is unclear whether MRPC ever used that money to obtain a performance bond or used the funds elsewhere. JX437.

On or about December 10, 2012, Crown and the various borrowers and guarantors executed the December LC Modification.

Crown employed Mr. Mirandi as its construction consultant. Mr. Mirandi was a part-time employee. JX72. Mr. Mirandi worked in construction his entire life, ascending from laborer to owning and managing engineering firms and construction companies. TT:9/23, 56:19-60:17. Mr. Mirandi retired from his construction business in 2001 but continued working as a consultant to various architects and engineers. TT:9/22, 133:14-21. Mr. Mirandi also began serving as an advisor or consultant to fellow professionals, including engineering firms. TT:9/22, 133:10-21. Mr. Mirandi was familiar with the inspection process for commercial construction projects through his experience working through companies he owned or co-owned. TT:9/23, 60:18-61:10. Mr. Mirandi had experience conducting inspections for architectural firms and engineering firms, including those certified on AIA documents. TT:9/23, 61:12-62:12.

Mr. Mirandi's responsibility pertained to performing construction inspections and preparing reports relating to construction draw requests for Crown. TT:9/22, 140:14-141:2. With respect to the draw practice, Crown would notify Mr. Mirandi by telephone that an MRPC draw application was ready for review. TT: 9/22, 149. Next, Mr. Mirandi would usually pick-up a hard copy of the MRPC draw application at Crown's headquarters. TT:9/22, 149. Mr. Mirandi would visit the Project and undertake the inspection. Mr. Mirandi would return to Crown's office to hand-deliver his inspection reports, typically at least a few days after he completed and signed his inspection report. TT: 9/22, 166: 20-23; 9/22, TT:9/22, 176: 1-2. Mr. Mirandi had no supervisor, TT: 9/22, 143, and was given no deadlines for scheduling a site inspection or completing his inspection reports for an MRPC draw request. TT:9/22, 152:1-17 Mr. Mirandi

21

testified that he was to submit a completed inspection report within a "reasonable time," which to him, meant whenever he was done with it. TT: 9/23, 19 :48.

Mr. Mirandi did not have the authority to approve change orders on behalf of Crown. TT:9/22, 196:19-22. The Plaintiffs went to great lengths at the Trial and in the post-Trial briefs to denigrate and discount Mr. Mirandi and his testimony at the Trial. Despite these efforts, the Court found Mr. Mirandi's testimony during the Trial on his inspection reports and the amount to be approved for disbursement to be credible and helpful. This is especially true when contrasted with Mr. C. Patel's testimony on the same issues.

### 4.      The Agreement

On December 19, 2012, Crown and MRPC executed and entered into a Construction Loan Agreement (the "Agreement") in the original principal amount of up to Twelve Million, Nine Hundred Eighty-Eight Thousand ($12,988,000.00) and 00/100 Dollars (the "Loan"). JX84. MRPC was to use the proceeds from the Loan for the acquisition of the Hotel, with its then existing 65 room hotel, from an entity affiliated with or owned by Paresh and Ranjan. JX23 at 1. MRPC also was to use the proceeds to expand and re-flag the Hotel as a Sheraton Four Points Hotel. JX 23 at 1; JX84; TT:8/1, 30:9-15.

The Agreement governs the Loan furnished by Crown to MRPC. As defined in the Agreement, Crown is the "Bank" and MRPC is the "Borrower." JX84 at 1. The Agreement defines "Completion Date" as December 2, 2013 "unless the Borrower exercises its right to extend the construction period for an additional six (6) months" pursuant to the Permanent Note's terms. JX84 at 1 (Art. I, sec. 1.1(d)). The "Improvements" are the planned improvements to be made to the Hotel. JX84 at 2 (Art. I, sec. 1.1(i)). The "Loan Documents" are the Commitment Letter (as modified), the Notes, the Construction Mortgage, the Mortgage,

22

the Guarantees, the Agreement and "all other documents executed and delivered to the Bank in connection with the Notes." JX84 at 2 (Art. I, sec. 1.1(l)).

The Agreement is an arms-length transaction between two business entities. JX84 at 1 and 18. The Agreement provides that it will be "governed by and construed and interpreted in accordance" with New Jersey law. JX84 at 16 (Art. VIII, sec. 8.1(h)). The Agreement is a loan agreement and does not create a business partnership between Crown and MRPC. The Agreement, at Article VII, section 8.1(i), states:

> It is hereby acknowledged by Bank and Borrower that the relationship between them created hereby and by the Loan Documents is that of creditor and debtor and is not intended to be and shall not in any way be construed to be that of a partnership, a joint venture, or principal and agent; and it is hereby further acknowledged that any control or supervision over the construction of the Improvements by Bank or disbursement of any Loan proceeds to any one other than Borrower shall not be deemed to make Bank a partner, joint venture, or principal or agent of Borrower, but rather shall be deemed to be solely for the purpose of protecting Bank's security for the indebtedness evidenced by the Notes and other indebtedness of Borrower to Bank.

JX84 at 16-17.

Crown must exercise good faith and act reasonably when approving, being satisfied or when exercising its discretion. JX84 at 15 (Art. VIII, sec. 8.1(a)).

The Agreement and its provisions cannot be changed except by an instrument in writing signed by both Crown and MRPC. JX84 at 16 (Art. VIII, sec. 8.1(c)). Moreover, the Agreement cannot be waived, discharged or terminated except through written instrument signed by both parties. JX84 at 16 (Art. VIII, sec. 8.1(c)).

Article II provides for the various representations and warranties of MRPC. Specifically, Article II, section 2.1 lists the MRPC's representations and warranties. JX84 at 2-3 (Art. II, secs. 2.1(a)-(h)).

23

Article III provides for "Certain Covenants of Borrower." JX84 at 4-6 (Art. III, secs. (a)-x)). Article III, section (a) provides that:

> Borrower has or will commence and shall hereafter diligently pursue construction of the Improvements, and Borrower shall complete the erection of the Improvements with due diligence on or before the Completion Date in compliance in all material respects with the Plans and this Agreement.

JX84 at 4.

Article III, section (b) governs modifications or amendments to Plans, providing that no material modifications can be made without first obtaining the written approval of Crown. JX84 at 4 (Art. III, sec. (b)).

Article III, section (n), provides the following covenant entered into by MRPC:

> [b]orrower shall duly perform and observe all of the covenants, agreements and conditions on its part to be performed and observed hereunder and under any and all other agreements and instruments herein mentioned to which Borrower is a party, or is subject, and Borrower will not, without the prior written consent of Bank, surrender, terminate, cancel, rescind, supplement, alter, revise, modify or amend any such other agreement or instrument or permit any such other agreement or instrument or permit any such action to be taken.

JX84 at 5-6.

Through Article III, section (o), MRPC agreed that the terms and conditions of the Loan Commitment are incorporated into the Agreement. Moreover, MRPC agreed that in the event that the terms of the Loan Commitment and the Agreement conflict then the Agreement controls. JX84 at 6 (Art. III, sec. (o)).

Article IV of the Agreement provides the relevant obligations of both parties as to the funding or disbursement of the proceeds. Article IV, section 4.1 provides:

> Subject to the terms and conditions set forth in this Agreement, including, without limitation, the conditions set forth in Article V and VI hereof, Bank agrees to make disbursements to Borrower of the Loan funds up to the full amount set forth herein, in accordance with the Construction Cost Estimate set forth in Exhibit "C" pursuant to and subject to Borrowers' compliance with the following procedures….

24

JX84 at 7. Article IV, section 4.1(a)-(e) goes on provide that Crown agrees to make

disbursements of funds to MRPC so long as MRPC complies with certain procedures:

- prior to a disbursement, MRPC needs to complete, execute and deliver an application for an advancement (on Crown's standard form draw request) with copies of all valid building permits, approvals, and bring down of title and such other information requested by Crown (defined as a "Draw Request");

- if requested by Crown, the Draw Request must provide information regarding subcontractors to be paid through the Draw Request;

- the Draw Request must be in a form satisfactory to Crown, submitted at least five working days before the date when MRPC wants the funds and that there be no more than one Draw Request per month unless Crown elects otherwise;

- at Crown's discretion, each Draw Request is subject to an inspection report by Crown's consulting architect, engineer or representative certifying as to the progress of construction, the conformity of the construction to the plans, the quality and value of the work completed and the percentage of work completed, and certifying that the costs to be paid are costs set out in the trade cost breakdown and are costs incurred in connection with the planned construction; and

- special procedures for additional disbursements after initial disbursements of (i) $3,143,000 for purchase of the Hotel; (ii) $55,000 for eligible closing costs; (iii) $539,780 for eligible soft costs; and (iv) $9,250,000 for balance of construction and site improvements.

In addition, Crown would only be advancing 90% of any approved Draw Request with the

remaining 10% paid upon completion as evidenced by a permanent Certificate of Occupancy.

JX84 at 7-8 (Art. IV, sec. 4.1(f)).

Article IV goes on to govern the amount of funds to cover the construction

($9,250,220);[40] that funds will be made in accordance with Exhibit B ("Plans and

Specifications"); how the advances can be made and credited. JX84 at 8 (Art. IV, secs. 4.4, 4.5

---

[40] Article IV, section 4.4 provides that the $9,250,220 would be broken down as follows: (i) $7,963,720 for construction at the Hotel; (ii) $611,500 to fund an additional cash reserve account; (iii) $50,000 to fund a performance bond; and (iv) $625,000 for an interest reserve demand account for the initial 12 month construction period to be debited monthly.

and 4.6). Crown goes on to reserve its rights to make disbursements without complying with Article IV to protect the collateral, or that any advancement of Loan proceeds does constitute a waiver of Crown's rights with respect to future advances. JX84 at 8-9 (Art. IV, secs. 4.7 and 4.8).

MRPC and/or Crown failed to attach Exhibit B to the Agreement. Testimony at Trial demonstrated that the Plans and Specifications for the Hotel are attached to the AIA contract between MRPC and BCD as Attachments "B" and "F." JX182. Exhibit B is the Drawing List, dated August 17, 2012. JX182 (Art. 9, secs. 9.1.4 and 9.1.5 and Attachment B). Exhibit F is the Schedule of Values for the work to be done and totals $7,315,665. JX182 (Art. 4, sec. 4.1 and Attachment F).

Article IV, section 4.14 relates to cash collateral, a certificate of deposit, and provides as follows:

> Certificate of Deposit: The Borrower shall fund a certain Certificate of Deposit in the amount of $1,500,000 at the Bank, which shall be assigned to the Bank pursuant to the terms of that certain Security Agreement and Assignment of even date herewith. This Certificate of Deposit shall be released at the time the Interim Note is paid in full. The P&I Reserve Account as set forth in Section 4.13 shall be funded from this Certificate of Deposit with the balance being returned to the Borrower.

JX84 at 9. The $1,500,000 in cash collateral was provided; however, Crown put it into a money market account instead of Certificate of Deposit. The evidence at Trial demonstrates that MRPC knew that Crown held the $1,500,000 in a money market and not a Certificate of Deposit. JX649.

Article V sets out the conditions precedent to Crown making of the initial advancement of funds, and Article VI relates to subsequent conditions precedent to Crown making subsequent advances. In addition, Article VII governs Default and Remedy. Article VII, section 7.1 asserts,

26

in relevant parts, that the Borrower shall be in default under either of the following circumstances:

> (a) any default or event of default shall occur under any of the other Loan Documents or Borrower shall breach or fail to perform, observe or meet any covenant or condition made in any of the other Loan Documents and such default, event of default, breach or failure shall not have been cured prior to the expiration of any applicable cure period expressly provided in any of the Loan Documents; or (b) Borrower breaches or fails to perform, observe or meet any covenant or condition made in this Agreement; or
> 
> ****
> 
> (n) Borrower fails to close the SBA Loan and cause the SBA Loan to be funded to payoff the Interim Note on or before the Maturity Date…

JX84 at 13-14. Article VII, section 7.2 states that the occurrence of any default or event of default constitutes a default under each of the Loan Documents. JX84 at 14. Importantly, Article VII, section 7.5 provides that in the occurrence of default by the Borrower, Bank:

> [s]hall be entitled to enter upon and assume possession of the Premises and protect, maintain, construct, install, and complete the Improvements in accordance with the Plans and such changes thereto as Bank may, from time to time, in its sole discretion, deem appropriate, all at the risk, cost and expense [sic] of Borrower… [f]or this purpose Borrower hereby irrevocably constitutes and appoints Bank its true and lawful attorney-in-fact with full power of substation to complete the Improvements in the name of Borrower and hereby empowers Bank, as said attorney, to take all action necessary in connection therewith…

JX84 at 14.

### 5. The Notes

The Loan is divided into two (2) notes—the Permanent Note and the Interim Note. The Permanent Note is in the principal sum of Seven Million, Six Hundred Forty Thousand and 00/100 ($7,640,000.00) Dollars. JX85. The Interim Note is in the amount of Five Million Three Hundred and Forty Eight Thousand and 00/100 ($5,348,000.00) Dollars. JX134. The Interim Note was to be paid off upon the closing and funding of a Small Business Administration

27

("SBA") loan. JX134. MRPC and Crown executed the Permanent Note and Interim Note (collectively, the "Notes") on December 19, 2012. JX85 at 1; JX134 at 1.

As developed at the Trial, the Interim Note was structured in a way so that it could be converted into a SBA qualified second mortgage loan (the "SBA Loan"). The SBA Loan would be from the Community Development Program (referenced by the parties as the "CDC"). The CDC is a quasi-governmental nonprofit organization. TT:9/21, 244:13-17. The CDC does second mortgages but not construction loans. As such, the Interim Note was a bridge loan during construction that would get paid off by proceeds from the SBA Loan. This would have meant that Crown would be the lender only on the Permanent Note. The lender on the SBA Loan was to be DelVal, a SBA 504 lender. TT:9/22, 93:14-94:6; TT:9/21, 247:4-8.

The Permanent Note is in the principal sum of $7,640,000.00. JX85 at 1. Pursuant to the Permanent Note, the Borrower promises to pay Bank: the "principal sum of Seven Million Six Hundred Forty Thousand and 00/100 ($7,640,000.00) Dollars, at the per annum rate of interest as set forth below…" JX85 at 1. The Permanent Note makes reference to the Agreement. JX85 at 1. The Permanent Note defines the term "Principal" as the amount actually advanced pursuant to the Agreement. JX85 at 1. The Permanent Note then defines "Loan" as the entire Principal and all accrued interest. JX85 at 1.

The Permanent Note has been executed by MRPC as the Borrower. JX85 at 5. The Permanent Note was also executed by the Guarantors. JX531 at 3. Specifically, Mr. C. Patel's signature appears above his name as well as above that for the Trust. JX531 at 3; TT:9/23 3:13-4:2. Mr. P. Patel and Ms. R. Patel executed the Permanent Note as well, their signatures appearing above their respective names, as Guarantors, for the bridge period. JX531 at 3; TT:9/23 4:4-6. Mr. C. Patel also executed the Permanent Note during bridge and income

28

stabilization period on behalf of Krishnas, BWI, and Ganesa.  JX531 at 3; TT:9/23 4:7-10.

With respect to MRPC's obligation under the Permanent Note, it states that MRPC will

pay—

> [t]he Principal and unpaid interest as follows: From the date hereof until December 2, 2013 (the "Construction Phase"): Payments during the Construction Phase on the Loan of interest only shall commence on February 2, 2013 and shall be due and payable on the second (2nd) day of each consecutive month thereafter until the end of the Construction Phase and upon conversion to the Permanent Phase or if the Extension (as hereinafter defined) is exercised, the Extended Construction Phase as hereinafter set forth.

> At the end of the Construction Phase, subject to the Extension, and pursuant to the terms of the Loan Agreement on conversion to the Permanent Phase (as hereinafter defined): Payment over the immediately following ten (10) year period (the "Permanent Phase"), based on a twenty-five (25) year amortization, subject to the Interest rate adjustments set forth below of Principal and Interest.

JX85 at 1.

MRPC had the option of extending the term of the Construction Phase for an additional

six (6) month period until June 2, 2014 or until the funding of the SBA Loan (the "Extension").

JX85 at 1.  If MRPC opted for the Extension, MRPC was to pay Crown an extension fee in an

amount equal to 1/2% of the Loan.  JX85 at 1.

The Permanent Note provides how to calculate interest during the term of the Agreement.

The Permanent Note, at "Interest Rate," states that interest during the Construction Term accrues

at the per annum rate of the *Wall Street Journal* Prime Rate plus 375 basis points (3.75%), with a

minimum per annum interest rate (a floor) of seven percent (7%) per annum.  JX85 at 2.  Interest

during the Permanent Term, as defined in the Permanent Note, accrues for the first five (5) years

of the Permanent Term at the then prevailing Federal Home Loan Bank Five Year Advance Rate

(the "NYFHLB") plus 400 basis points (4%), or at Crown's option, the Wall Street Journal

Prime Rate plus 375 basis points (3.75%), with a minimum per annum interest rate (a floor) of

seven percent (7%). JX85 at 2. Interest for the second five (5) years of the Permanent Term is fixed to the then prevailing NYFHLB rate plus 400 basis points (4%), or at Crown's option, the *Wall Street Journal* Prime Rate plus 375 basis points (3.75%), with a minimum per annum interest rate (a floor) of seven percent (7%). JX85 at 2.

Payments of interest only were due and payable monthly under the Permanent Note during the Construction Phase, commencing on February 2, 2013 and continuing on the second (2nd) day of each month thereafter, until the end of the Construction Phase and upon conversion to the Permanent Phase as defined therein, or if the Extension as defined therein is exercised, the Extended Construction Phase, as also defined therein. JX85 at 2. The Permanent Note provides that in the event any payment is not made thereunder within 10 days of the date it is due, then a late charge of five percent (5%) of the overdue payment shall also be due and payable to Bank. JX85 at 1.

Under the "Prepayment" section, the Permanent Note also provides for a two percent (2%) prepayment premium in the event the Loan does not convert to the Permanent Term Loan after the Construction Phase, subject to the Extension. JX85 at 2. Moreover, the Permanent Note also sets forth a provision governing collateral, with states, in pertinent part:

> [t]he indebtedness evidenced by this Note and the obligations created hereby are secured, inter alia, by that certain first lien Mortgage, Security Agreement and Fixture Filing (Construction) dated even date herewith (hereinafter referred to as the "Mortgage"), between the Borrower, as "Mortgagor", and Bank, as "Mortgagee", encumbering and mortgaging the Borrower's right, title and interest in properties lying and being in the City of Newark, County of New Castle and State of Delaware located at 56 South Old Baltimore Pike … as the same is more particularly described in the Mortgage (hereinafter referred to as the "Premises"), an Assignment of Leases and Rents on the Premises, all property fixed or to be affixed on the Premises, and all business assets of the Borrower; as security for the performance by the Borrower of its obligations hereunder.

JX85 at 3.

The "Event of Default" section of the Permanent Note provides that it shall constitute a default, if any payment is not made when due thereunder or under any of the Loan Documents as defined in the Agreement, which includes the Permanent Note, or if MRPC fails to comply with any of its covenants, conditions or undertakings contained in the Agreement. JX85 at 3.

With respect to costs of collection, under the section titled "Event of Default", the Permanent Note mandates that MRPC "shall pay the cost of collection of any and all sums due and owing hereunder and not paid, including without limitation court costs and reasonable attorney's fees in connection with the collection of any such sums." JX85 at 3. The Permanent Note also provides that the "failure to satisfy the post closing requirements of the Loan Agreement, shall, at the sole discretion of Bank, be an event of default." JX85 at 3.

Upon a default under the Permanent Note, interest is increased thereunder by five percent (5%) per annum. JX85 at 3. In addition, Crown is entitled to be reimbursed for its attorneys' fees and costs it incurred in collecting the Loan upon a default of the Permanent Note. JX85 at 3.

The Interim Note is in the amount of $5,348,000.00. JX134 at 1. The Interim Note has been executed by MRPC. JX595 at 2; TT:10/21, 53:16-54:5. The Interim Note has also been executed by the Guarantors. JX595 at 3. Mr. P. Patel executed the Permanent Note as well, his signatures appearing above his respective names, as Guarantor, for the bridge period. JX595 at 3; TT:10/21, 54:6-11. Mr. C. Patel also executed the Permanent Note during bridge and income stabilization period on behalf of Krishnas, BWI, and Ganesa. JX595 at 3; TT:10/21, 53:16-54:5.

The Interim Note states that MRPC shall pay the Principal as follows:

[p]ayments on the Loan of interest only shall commence on February 2, 2013 and shall be due and payable on the second (2nd) day of each consecutive month thereafter until the Maturity Date (as hereinafter defined), or if the Extension is exercised, the Extended Maturity Date, as hereinafter set forth. The entire unpaid

31

principal balance and all accrued and unpaid interest outstanding shall be due and payable upon the funding of SBA Loan #55286950-00, approved October 31, 2012, and in no event at a date later than December 2, 2013 (the "Maturity Date"), subject to the Extension (as hereinafter defined). Interest will be calculated on the amount of the Principal that is outstanding.

JX134 at 1. MRPC's obligations under the Interim Note are:

[t]he Borrower shall have the option to extend the term of the Maturity Date for an additional six (6) month period (the "Extension"), until June 2, 2014 (the "Extended Maturity Date") provided that (i) the Borrower exercises its right to extend by providing the Bank with written notice of its intention to extend on or before thirty (30) days prior to the Maturity date; (ii) no event which is or, with the passage of time or giving of notice or both, could become an Event of Default, shall have occurred or be continuing; and (iii) the Borrower shall have paid to the Bank an extension fee in an amount equal to ½% of the Principal balance at the Maturity Date.

JX134 at 1.

The Interim Note, in the section titled "Interest Rate", provides how to calculate interest. Interest accrues under the Interim Note at the per annum rate of the *Wall Street Journal* Prime Rate plus 375 basis points (3.75%), with a minimum per annum interest rate (a floor) of seven percent (7%). JX134 at 1. Payments of interest only were due and payable monthly under the Interim Note commencing on February 2, 2013, and continuing on the second (2nd) day of each month thereafter until December 2, 2013, or if the Extension is exercised, on or before June 2, 2014. JX134 at 1. Further, the Interim Note provides that in the event any payment is not made thereunder within ten (10) days of the date it is due, then a late charge of five percent (5%) of the overdue payment shall also be due and payable to Crown. JX134 at 1.

The Event of Default section provides that MRPC shall be in default, if, among other things, it fails to: (1) make payment in accordance to the plain terms and conditions, as set forth above; (2) close the SBA Loan; (3) comply with any of its covenants, conditions or undertakings

32

contained in the Agreement; or (4) enters into default under any other of the Loan Documents, which includes the Permanent Note. JX134 at 2.

Similar to the Permanent Note, with respect to costs of collection, the Interim Note mandates that the MRPC "shall pay the cost of collection of any and all sums due and owing hereunder and not paid, including without limitation court costs and reasonable attorney's fees in connection with the collection of any such sums." JX134 at 2. The Interim Note also provides that the "failure to satisfy the post closing requirements of the Agreement, shall, at the sole discretion of the Bank, be an event of default." JX134 at 2. Notably, upon default under the Interim Note, interest is increased thereunder by five percent (5%) per annum. JX134 at 2.

**6.      The Security Agreement**

On December 19, 2012, MRPC executed a Security Agreement (the "Security Agreement") in favor of Crown as part of the consideration for the loan under the Permanent Note. JX89. MRPC is defined as the "Debtor" or "Borrower" in the Security Agreement and Crown is defined as the "Lender." Under Section 1.2(c) of the Security Agreement, MRPC granted Crown, the Lender, a security interest in a first lien on and pledge and assignment of the "Collateral," as defined as MRPC's:

> [f]uture right, title, and interest in and to any and all of the personal property of Debtor whether such property is now existing or hereafter created, acquired or arising and whatever located from time to time, including without limitation: (i) accounts; (ii) chattel paper; (iii) goods; (iv) inventory; (v) equipment; (vi) fixtures; (vii)    farm products; (viii) instruments; (ix) investment property; (x) documents; (xi) commercial tort claims; (xii) deposit accounts; (xiii) letter-of-credit rights; (xiv) general intangibles; (xv) supporting obligations; and (xvi) proceeds and products of the foregoing.

JX89 at 1-2. Section 3.1 of the Security Agreement, governing payments and performance, states that MRPC covenanted to "duly and punctually pay all Obligations becoming due under

the Note and Loan Documents and … duly and punctually perform all Obligations on its part to be done or performed under this Agreement, the Note, and the Loan Documents."  JX89 at 5.

Section 4 of the Security Agreement governs default.  The governing provision under subsection 1 defines an "Event of Default" as follows:

> (a) default of any liability, obligation, covenant or undertaking of the Debtor to the Lender, hereunder, under the Note, the Loan Documents or any other loan documents, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Debtor under any other Loan Document or any other agreement of Debtor or Debtor with the Lender;…
> (c) default of any material liability obligation or undertaking of the Debtor to any other Person, continuing for 10 days.

JX89 at 6-7.  Section 4.2 provides for an acceleration clause:

> [i]f an Event of Default shall occur, which continues beyond any notice and cure periods, if any, at the election of the Lender, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on DEMAND, which shall be due and payable on DEMAND, whether or not an Event of Default has occurred.

JX89 at 7.

## 7. The Guaranty Agreements

Mr. C. Patel, the Trust, Krishnas, BWI, Ganesa, Mr. P. Patel, and Ms. R. Patel (collectively, the "Guarantors"), executed certain guaranty agreements (collectively referred to as the "Guaranty Agreements") in favor of Crown in connection with the Agreement.  The Guaranty Agreements are comprised of guarantees of payment (the "Guarantees of Payment") and guarantees of completion (the "Guarantees of Completion").  Crown required MRPC and related parties to provide extra collateral and guarantees to back the Loan and secure funding for the Project.

The Guaranty Agreements absolutely and unconditionally guarantee payment and performance, as was required by Crown to enter into the Loan.  TT:8/1, 75:18-78:4.

34

The language found in the Guaranty Agreements is identical in each of the contracts.  The Guarantees of Payment[41] expressly provide that Crown, referred to as the "Bank," is unwilling to lend to MRPC without execution of the Guarantees of Payment.  Section 2 of the Guarantees of Payment states, in pertinent part:

> [G]uarantor hereby absolutely and unconditionally guarantees the Bank the prompt payment, when due, whether by maturity, acceleration or otherwise, of all present or future obligations or liabilities of the Borrower to the Bank, whether now existing or arising after the date of this Guaranty … together with all modifications, extensions, or renewals of the obligations or liabilities.  This Guaranty covers obligations and liabilities incurred by the Borrower in any capacity … All such obligations and liabilities set forth herein, together with interest and all reasonable fees, costs, expenses, attorneys' fees and other costs of collection incurred or paid by the Bank, are together referred to as the "Indebtedness."

Guarantees of Payment at 1.  Section 3 of the Guarantees of Payment, titled "Guaranty Absolute and Unconditional" states, in pertinent part:

> [t]he liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of: (a) any lack of validity or enforceability of any of the Loan Documents … or (f) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Borrower, any guarantor or other obligor in respect of the Indebtedness or the Guarantor in respect of this Guaranty…
>
> This Guaranty is a continuing guarantee and shall remain in full force and effect until all of the Indebtedness has been paid in full and will continue to be effective…

Guarantees of Payment at 1.

The Guarantors each also executed a Guaranty of Completion.[42]  Section 2 of the Guarantees of Completion set forth the Obligations of the Guarantors, including but not limited to: (a) Completion of the Improvements, free and clear of all Liens on or before the Completion

---

[41] Each Guarantor's respective Guaranty of Payment (the "Guarantees of Payment") for the Permanent Note and the Interim Note is found in the record as follows: Krishnas (JX94, JX141); BWI (JX100, JX146); Ganesa (JX109, JX153); Mr. P. Patel (JX116, JX158); Ms. R. Patel (JX119, JX160); Mr. C. Patel (JX122, JX162); and the Trust (JX124, JX164).

[42] Each Guarantor's respective Guaranty of Completion (the "Guarantees of Completion") for the Permanent Note and the Interim Note is found in the record as follows:  Krishnas (JX95); BWI (JX101); Ganesa (JX110); Mr. P. Patel (JX117); Ms. R. Patel (JX120); Mr. C. Patel (JX123); and the Trust (JX125).

date; (b) the complete and timely performance of Borrower's obligations; and (c) payment in full of any and all reasonable expenses that may be paid or incurred by the Lender in collection. Guarantees of Completion at 2. The Guarantees of Completion are an absolute, unconditional, present and continuing guaranty of payment and performance. Guarantees of Completion at 2-3.

### 8. The MRPC Mortgages

As further security, MRPC and Crown entered into the Open-End Mortgage, Security Agreement and Fixture Filing (Construction) (the "Permanent Note Mortgage"). JX86. The Permanent Note Mortgage was recorded on December 21, 2012 in the Office of the Recorder of Deeds, New Castle County, beginning at Instrument No. 20121221-0075519 becoming a first position lien upon certain real and personal property held by MRPC. JX87 at Exhibit A and Schedule B. Crown also recorded numerous UCC and fixture filings. JX90-93.

Similarly, MRPC and Crown entered into an Open-End Mortgage, Security Agreement and Fixture Filing (Construction) (the "Interim Note Mortgage", and collectively with the Permanent Note Mortgage, the "MRPC Mortgages"). JX135. The Interim Note Mortgage was recorded on December 21, 2012 in the Office of the Recorder of Deeds, New Castle County, beginning at Instrument No. 20121221-0075526 becoming a second position lien upon certain real and personal property held by MRPC. JX135 at Exhibit A and Schedule B. Crown also recorded numerous UCC and fixture filings. JX137-140.

The MRPC Mortgages are identical in their terms, with exception to the mortgage note being secured. The MRPC Mortgages define MRPC as the "Mortgagor" and Crown as the "Mortgagee." JX86 at 2; JX135 at 2. Under Section 1, the MRPC Mortgages state the obligation secured therein:

> [m]ortgagor shall pay promptly to Mortgagee the principal of and interest upon the
> Note according to the terms of the Note and all other amounts owing by Mortgagor

36

to Mortgagee under the [sic] Note secured hereby, including all other amounts secured hereby from time to time or expended by Mortgagee, with interest thereon at the rate set forth in the Note, and shall keep and perform every other term, provision, covenant and agreement of the Note and this Mortgage, subject to applicable notice, grace and cure periods set forth therein, if any.

JX86 at 3; JX135 at 3. The maximum unpaid principal balance for the MRPC Mortgages is the loan amounts, or $7,640,000.00 and $5,348,000.00, respectively. JX86 at 2; JX135 at 2.

The MRPC Mortgages also create "a security interest in the personal property and fixtures" included in the term "Premises," which is defined as the Hotel. JX86 at 2; JX135 at 2.

Section 11 of the MRPC Mortgages governs "Events of Default," which defines events that constitute default under the agreement:

A. The failure of Mortgagor to pay any installment of interest, or principal, under the terms of the Note and this Mortgage within ten (10) days of their due date;
B. The failure of Mortgagor to duly observe or perform any covenant, condition or agreement with respect to the payment of moneys on the part of Mortgagor to be observed or performed pursuant to the terms of the loan documents other than the payment of principal and interest which shall be governed by Subsection (A) above, and such default shall have remained uncured for a period of ten (10) days after notice thereof to Mortgagor;…
H. If an Event of Default as defined in the Loan Agreement shall occur and shall not be cured within the grace period provided herein.

JX86 at 6; JX 135 at 6.

Section 12 of the MRPC Mortgages, titled "Remedies," sets forth the relief contractually available to Crown should one of the defined Events of Default occur, in that:

[t]he entire unpaid balance of the principal, the accrued interest, and all other sums secured by the Mortgage, shall, at the option of the Mortgagee, become immediately due and payable without further notice or demand, and in any such Event of Default, Mortgagee may forthwith undertake any one or more of the following, to the extent permitted by applicable law:

A. Recover judgment against Mortgagor for the entire unpaid principal balance, accrued interest, and all other sums secured by this Mortgage; and neither the recovery of judgment nor the levy of execution thereof on any property, including the Premises, shall affect Mortgagee's rights hereunder or the lien hereof;

37

B.  Enter upon and take possession of the Premises, or have a receiver of the rents, issues and profits thereof appointed…;

C.  Assume full control of the Premises and complete the construction thereof as it sees fit in its absolute discretion;

D.  Take such other action to protect and enforce Mortgagee's rights hereunder and the lien hereof, as Mortgagee deems advisable, including:

> (1) The foreclosure hereof, subject, at Mortgagee's option, to the rights of tenants and other persons in the Premises; and/or
>
> (2) The sale of the Premises in a foreclosure proceeding in one or several parcels, at Mortgagee's option, and without obligation to have the Premises marshaled.

JX86 at 7; JX135 at 7.

Section 13 governs Counsel Fees and provides:

If Mortgagee becomes a party (by intervention or otherwise) to any action or Proceeding affecting the Premises or the title thereto or Mortgagee's interest under this Mortgage, or employs an attorney to collect any of the indebtedness or to enforce performance of the obligations, covenants and agreements secured hereby, or to advise Mortgagee with respect to its rights and remedies hereunder and under the Note in case of an Event of Default or threatened Event of Default, Mortgagor shall reimburse Mortgagee, forthwith upon written notice and without further demand, for all reasonable costs, charges and counsel fees incurred by Mortgagee, in any such case, whether or not suit be commenced, and the same shall be added to the principal sum secured hereby as further charge and lien upon the Premises and shall bear interest at the rate provided for in the Note, to the maximum extent permitted by applicable law.

JX86 at 7; JX135 at 7.

Section 23 governs use of the premises after default.  This provision of the MRPC Mortgages states, that, after an Event of Default occurs, and the expiration of any applicable grace period, "Mortgagor … shall, upon the demand of Mortgagee, become a month-to-month tenant of Mortgagee…"  JX86 at 9; JX135 at 9.

### 9. The Guaranty Mortgages

As a means of additional guaranty for the Loan, the Guarantors, with the exception of Mr. C. Patel, executed and delivered their own Guaranty Mortgage, Security Agreement, and Fixture Filings ("Guaranty Mortgages")[43] pertaining to the Notes. The Guaranty Mortgages have identical governing provisions as previously set forth as applicable in the MRPC Mortgages, with the exception that the respective Guarantor is defined as the "Mortgagor" in the Guaranty Mortgages. Moreover, the Guaranty Mortgages provide security as additional collateral, as owned by the Guarantors and as defined in the Guaranty Mortgages and appended as Exhibit "A".

Specifically, Krishnas provided the Country Inn Hotel as collateral under its Guaranty Mortgage (the "Krishnas Guaranty Mortgage"). JX96 at Ex. A. Mr. P. Patel and Ms. R. Patel provided a lien upon their personal residence, the Patel Residence, under their Guaranty Mortgage (the "Patel Guaranty Mortgage"). JX118 at Ex. A; TT:8/1, 76:11-78:4. BWI provided a first mortgage upon the BWI Property as collateral under its Guaranty Mortgage (the "BWI Guaranty Mortgage"). JX105 at Ex. A. Ganesa provided a first mortgage upon the New Jersey Collateral as collateral under its Guaranty Mortgage (the "Ganesa Guaranty Mortgage"). JX111 at Ex. A; TT:8/2, 163:21-164:8.

### 10. Assignments of Leases and Rents

MRPC, along with the Guarantors that own property that was offered as collateral, each respectively executed an Assignment of Leases and Rents with respect to the Notes.[44] The

---

[43] Each Guarantor's respective Guaranty Mortgage for the Notes (Permanent Note and Interim Note) is found in the record as follows: Krishnas (JX96, JX142); BWI (JX105, JX146); Ganesa (JX111, JX154); Mr. P. Patel (JX118, JX159); Ms. R. Patel (JX121, JX160); and the Trust (JX127, JX165).

[44] Each Assignors' respective Assignment for the Notes (Permanent Note and Interim Note) is found in the record as follows: MRPC (JX88, JX136); Krishnas (JX97, JX143); BWI (JX106, JX150); and Ganesa (JX112, JX155).

Assignments were all executed on December 19, 2012.  Specifically, MRPC provided assignment of any and all leases and rents related to the Property, Krishnas provided assignment of any and all leases and rents related to the Second Hotel Property, BWI provided assignment of any and all leases and rents related to Maryland Property, and Ganesa provided assignment of any and all leases and rents related to the New Jersey Collateral.

The Assignments are identical in terms of operative language, with the exception of differing language pertaining to the Assignor, identification of the Assignor, and the description of the mortgaged property, as identified in detail in Exhibit "A" to the Assignments.  The Assignments provide that the Assignor, in consideration of the Loan, "assigns, transfers, and sets over to the Bank all of its rights, title, and interest in and to all those leases, tenancies, rental agreements, occupancy agreements, and subleases (the "Leases") now or hereafter existing and affecting all or any portion of the Mortgaged Property, and any and all extensions thereof…" Assignments at 3.  The Mortgaged Property is defined therein as the property owned by the Assignor.   Assignments at 2.

Section 2 of the Assignments sets forth that the Assignor covenants and agrees:

(a)(i) To duly and timely observe, perform, and discharge all the obligations, terms, covenants, conditions, and warranties of the Loan Documents and each Lease on the part of the Assignor to be kept, observed and performed, and (ii) to give immediate written notice to the Bank of any failure on the part of the Assignor to do so under a Lease and of any default notice received from a lessee…

Assignments at 4.  Moreover, Section 6 of the Assignment provides that in the Event of Default, as defined in the Loan Documents or under the Assignment itself, Crown shall have the right and power to exercise and enforce its rights as follows:

(a)  To revoke the license granted to the Assignor pursuant to the terms of this Assignment to collect the Rents, and then thereafter, without taking possession, in the Bank's own name, to demand, collect, receive, sue for, attach and levy the Rents…;

40

(b) To declare all sums evidenced by the Note and secured by the Assignment and by the Mortgage immediately due and payable and, at its option, exercise any and all of the rights and remedies provided in any of the Loan Documents, or at law or in equity and/or;

(c) Without regard to the adequacy of any security, and with or without any action or proceeding through any person or by agent or court-appointed receiver and irrespective of the Assignor's possession, then or thereafter to enter upon, take possession of, manage and operate the Property, or any part thereof…

Assignments at 6-7.

Crown advanced all of the loan proceeds to or for the benefit of MRPC. JX662. At the Loan closing on December 19, 2012, Crown made four (4) disbursements, to include the initial $3,733,280.00 wire advance, $611,500.00 for the credit cash contingency account, $625,000.00 for the credit interest reserve account, and $54,500.00 for closing costs. JX662. The Loan had an original Completion Date of December 2, 2013, which could be extended until June 2, 2014 if MRPC exercised the Extension. JX84 at 1.

**11.     MRPC Hires BCD as it General Contractor**

In August of 2012, MRPC hired BCD Associates, LLC ("BCD") as its general contractor. TT: 8/1, 37:22-38:5. MRPC and BCD executed an AIA contract, later revised on October 9, 2012 (as revised, the "AIA Contract"). JX44. The AIA Contract was revised because Crown required that MRPC remove the bond from the hard cost budget and move the bond expense to soft costs so it could be paid at closing. JX38; TT: 8/1, 59:13-23. Crown is not a party to the AIA Contract.

BCD is a joint venture between Bancroft Construction Company ("Bancroft") and Carrollton Design Build ("Carrollton"). TT: 8/4, 4:12-14. Bancroft is an established Delaware general contracting firm with over 20 years of construction experience. TT: 8/4, 4:17-5:2; JX774

41

at 11.  Before the Project, Carrollton had built "dozens of comparable hotels" involving third-party lenders.  TT: 8/4, 10:8-17.

Mr. Deignan, the president of Carrollton, acted as "project executive" for the Project.  TT: 8/4, 6:14-15.  BCD assigned James DiPaolantonio to oversee construction on the Project.  TT: 8/4, 6:22-7.  Bruce Bachman, who reported directly to Mr. DiPaolantonio, was BCD's onsite superintendent in charge of the day-to-day construction for the Project.  TT: 8/4, 33:3-5.  Mr. Bachman had worked for Carrollton for over 20 years.  TT: 8/4, 33:8-15.

Generally, the construction entailed removing the roof of the Hotel, constructing floors 4-6, adding a penthouse to house the HVAC units, reconfiguring the first-floor lobby, and making certain site improvements.  TT: 8/1, 30:22-31:4.  The Project also involved some renovations to the 2nd and 3rd floor.  *Id.*; JX778.  The AIA Contract fixed the price for the scope of work at $7,330,056.00.  JX44 at 3.

The date of commencement of construction under Section 3.1 of the AIA Contract between MRPC and BCD was to be thirty-days post-settlement, *i.e.*, January 19, 2013.  JX182 at 2.  BCD projected eight (8) months for construction, rendering the projection completion date in September of 2013. JX36; JX84.  The AIA Contract fixed the price for the scope of work at $7,330,056.00.  JX44 at 3; JX207.  Combined with contingency and an interest reserve, Crown committed to fund an additional $9,250,220.00.  JX 84 at 8; JX23 at Ex. A.  The Agreement provides how the $9,250,220.00 was to be allocated, of which up to $7,350,000.00 was for construction costs under the AIA Contract.  JX84 at 8; JX23 at Ex. A.

On September 11, 2012, Mr. C. Patel for MRPC, Mr. Deignan, Mr. DiPaolantonio, and Jack Barr for BCD, and Mr. Kneip and Mr. Mirandi for Crown, met at the Hotel (the "Pre-Closing Site Visit").  TT: 8/1, 59:3-9.  During this visit, Crown reviewed the construction plans

and budget for adequacy, which Mr. Mirandi would document in a report he submitted to Crown before Closing. JX33.

**12. Construction at the Hotel**

On January 24, 2013, a sprinkler pipe freeze and burst occurred at the Hotel (the "Sprinkler Incident"). The following day, Kevin Crumlish of BCD sent an e-mail to Mr. C. Patel providing notice that the Sprinkler Incident will have an impact on the construction schedule: "[b]ecause the contract specifies an end date, we are obligated to notify you that we will request a new end date once the impact on the schedule can be determined." JX198.

On Monday, January 28, 2013, at 1:44 p.m., Mr. C. Patel forwarded the BCD Delay Notification to Crown. JX199. Crown (Mr. Kneip) responded by e-mail just ten minutes later, at 1:54 p.m., advising that "[a]t this time the Bank will not consider a construction loan extension, however as the job proceeds and we get closer to completion, we will of course consider an extension (which must be approved by DelVal as well) at that time." JX199 (emphasis added).

Mr. C. Patel and Mr. Kneip discussed Crown's decision. TT: 8/1, 105:8-23; 128:14-17. BCD agreed with MRPC because redrawing and rebidding the Project would have allowed MRPC and BCD to "hit the pause button," and assess the increased scope of work and time. TT: 8/5, 16:6-17; TT: 8/4, 19:7-9 (Mr. Deignan testified that redrawing and rebidding the Project would have provided "a better global view of what we were in for financially, in terms of cost of reconstruction."); TT: 8/4, 23:1-7 (Mr. Deignan testifying that rebidding and redrawing would have mitigated construction costs and avoided "hundreds of pages of change orders"); JX768 at 13.

Crown reaffirmed that MRPC was "on the clock so just get started." TT: 8/1, 105:21; 136:10-11. Mr. Rodrigues confirmed that ". . . [Mr. Kneip] did tell [Charlie] we cannot extend

43

the maturing now when it's [MRPC] should start . . ." Ex. A at 162:9-11. Crown not take over control of the project at the Hotel, and did not instruct MRPC and BCD that the project must proceed or that it could not be rebid or redrawn. TT:9/21, 272:8-13.

MRPC and BCD agreed to address the Sprinkler Incident by creating construction change orders for additional construction work and costs. TT:8/1, 132:6-134:5; JX200.

MRPC submitted 23 draw requests (the "Draw Requests) during the lifetime of the Project. The Draw Requests are as follows:

| Draw Req. # | Period Ending | Rec'd by Crown | Insp. Report Date | Disburse Date | Amount Req'd | Insp. Recommended Amt. | Amt. Disbursed | Difference | Days from Draw Req. to Disburse | Days from Insp. Report to Disburse |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/31/13 | 2/18/13 | 2/21/13 | 3/11/13 | $86,363.21 | $64,466.85 | $65,466.85 | $20,896.36 | 21 | 18 |
| 2 | 2/28/13 | 3/19/13 | 3/19/13 | 4/1/13 | $108,801.82 | $108,801.82 | $108,801.82 | 0 | 13 | 13 |
| 3 | 3/31/13 | 4/5/13 | 4/12/13 | 4/17/13 | $136,265.86 | $136,265.88 | $136,265.8 | +$.02 | 12 | 5 |
| 4 | 4/30/13 | 5/7/13 | 5/17/13 | 6/11/13 | $480,759.59 | $480,759.62 | $478,571.73 | $2,187.86 | 35 | 25 |
| 5 | 5/31/13 | 6/14/13 | 7/1/13 | 7/2/13 | $650,486.82 | $650,486.86 | $650,486.85 | +$.03 | 18 | 1 |
| 6 | 6/30/13 | 7/9/13 | 7/16/13 | 7/29/13 | $727,008.87 | $625,396.39 | $687,982.54 | $39,026.33[45] | 20 | 13 |
| 7 | 7/31/13 | 8/19/13 | 8/28/13 | 9/5/13 | $796,317.47 | $604,613.90 | $604,613.90 | $191,703.57[46] | 17 | 8 |
| 8 | 8/31/13 | 9/24/13 | 10/2/13 | 10/4/13 | $850,749.66 | $850,749.64 | $850,749.64 | $.02 | 10 | 2 |
| 9 | 9/3/13 | 10/10/13 | 10/22/13 | 10/23/13 | $859,970.06 | $859,970.06 | $850,749.06 | 0 | 13 | 1 |
| 10 | 10/31/13 | 11/7/13 | 11/14/13 | 11/21/13 | $557,237.69 | $557,237.68 | $557,237.68 | $.01 | 14 | 7 |
| 11 | 11/30/13 | 12/3/13 | 12/17/13 | 12/18/13 | $622,562.63 | $603,683.90 | $622,562.64 | +$.01 | 15 | 1 |
| 12 | 12/21/13 | 1/2/14 | 1/21/14 | 2/4/14 | $354,718.06 | $183,385.51 | $183,385.51 | $171,332.55 | 33 | 14 |
| 13[47] | 1/3/14 | 2/10/14 | | | | | | | | |
| 14 | 3/31/14 | 4/22/14 | 4/22/14 | 5/7/14 | $782,552.96 | $782,552.97 | $782,552.97 | +.01 | 15 | 15 |
| 15 | 5/31/14 | 6/6/14 | 6/13/14 | 6/18/14 | $86,126.23 | $86,126.23 | $86,126.23 | 0 | 12 | 5 |
| 16 | 6/30/14 | 7/7/14 | 7/11/14 | 7/21/14 | $177,508.44 | $177,508.41 | $177,508.41 | $.03 | 14 | 10 |
| 17 | 7/31/14 | 8/12/14 | 8/14/14 | 8/20/14 | $223,847.46 | $223,847.47 | $177,508.41 | 46,339.05[48] | 8 | 6 |
| 18 | 8/31/14 | 9/16/14 | 10/7/14 | 10/8/14 | $221,760.21 | $221,760.47 | $126,440.96 | $95,319.25 | 22 | 1 |
| 19 | 9/30/14 | 10/11/14 | 10/2/14 | 10/23/14 | $353,328.93 | $353,328.96 | $353,328.96 | +$.03 | 10 | 2 |
| 20 | 10/31/14 | 11/13/14 | 12/10/14 | 12/22/14 | $374,455.73 | $119,083.13 | $103,725,.57 | $270,730.16 | 39 | 12 |
| 21 | 11/30/14 | 12/4/14 | | | $297,079.74 | | | $297,079.74 | | |
| 22 | 12/31/14 | 12/30/14 | | | $128,677.91 | | | $128,677.91 | | |
| 23 | 12/31/14 | 2/3/15 | | | $955,000.00 | | | $955,000.00[49] | | |
| Total Disbursed | | | | | | | $7,847,602.00 | | | |

[45] Crown disbursed an additional $39,026.33 on August 8, 2013. As such, the amount requested and the amount disbursed on Draw Request 6 are the same.

[46] Crown disbursed an additional $148,500.00 on October 4, 2013. As such, the amount requested and the amount disbursed on Draw Request is a difference of $43,203.57.

[47] Replaced by Draw Request 14

[48] Crown paid an additional $46,789.06 on September 26, 2014. Crown was correcting a wire authorization amount that mirrored the payment on July 21, 2014. In the end, MRPC received the total amount requested in Draw Request 17.

[49] Draw Request 23 represents the amount of unpaid retainage.

MRPC tracked the change orders for Sprinkler Incident costs and revisions to the construction project, which eventually increased the cost of the project by $2,219,944.00. JX703. In addition, MRPC incurred an additional $2,150,000.00 from a different lender. JX493. Thus, by completion of the construction project, construction and renovation costs expanded by $4,369,944.00, or approximately 50% of the original budget of $9,250,220.00.

**13.    The Modifications**

By November of 2013, as the project neared the Original Completion Date as defined in the AIA Contract, the contingency amounts allowed under the Loan had been exhausted to cover change orders. JX414. Yet, by the December draw application, MRPC had approved change orders totaling $1,172,418.96. JX439 at CB014384.

To cover the additional construction costs, Mr. C. Patel proposed, via e-mail, that the furniture fixture and equipment ("FF&E") in the budget be released and used for change orders and that MRPC be permitted to obtain a third-party lender to cover the FF&E. JX360. Mr. Kneip responded via e-mail: "[i]f you are to consider a new additional loan, we would have to be convinced cash flow based on the original projections would cover all payments. I am not sure that is the case." Mr. C. Patel responded that cash flows "aren't my concern, it is getting done…" JX360. Further explaining his response, Mr. Kneip testified that cash flow generated on a recurring basis from the business would need to be sufficient to cover Crown's first mortgage, the SBA second mortgage, and then if any remained for FF&E or working capital. TT:9/22, 55:12-20-56:9. Moreover, the proposal from Mr. C. Patel would place an FF&E lender in third position. TT:9/22, 56:10-13.

The parties negotiated, and ultimately reached an agreement to extend the Loan. JX531; JX595. On May 2, 2014, Crown and MRPC, with the consent of the Guarantors, executed and

45

entered into a Modification of Note Agreement (the "May Modification"), which in part extended the maturity date of the Notes to October 31, 2014 upon payment of a $69,940.00 extension fee, $5,000.00 modification fee, and $1,000.00 plan and cost review fee. JX531 at 1.

Under the May Modification, all amounts owed under the Loan were to be paid on October 31, 2014, and the prepayment penalty was increased to ten percent (10%) during the Construction Phase, subject to certain exclusions provided for therein, and in the event the Permanent Note converted to the Permanent Phase, the prepayment penalty of ten percent (10%) was to be reduced one percent (1%) each year during its stated term.[50] JX531 at 1.

Following the May Modification, MRPC entered into a new loan with Access Point Financial, Inc. JX493. With respect to Crown's commitment to the process:

> [w]e were told once it funded and got information that - - and at one point we notified the borrower that we would have to hold up funding because, again, of the issue of insufficient funds to complete the project until we knew that this lender was in place. And the bank agreed - - the decision makers approved to allow for this third lender to have a first lien on the FF&E, so we released that collateral.

TT:9/22, 57:10-23. The FF&E loan closed at the end of 2014. TT:9/22, 58:6-8.

Subsequent to the May Modification, Crown advanced an additional $2,483,215.53[51] in disbursements to MRPC.

At MRPC's request, the parties agreed to extend the loan again to allow the construction to continue. JX595. On September 29, 2014, Crown and MRPC, with the consent of the Guarantors, executed and entered into a Modification of Note Agreement (the "September Modification"), which in part extended the maturity date of the Notes to January 31, 2015 when

---

[50] Mr. Rodrigues testified that the ten percent (10%) prepaid penalty was agreed upon between Crown and MRPC as the compensation that Crown will receive for the loss of interest during the term of the Loan, should the Loan be repaid prior to the maturity. TT:11/7, 227:17-228:4.

[51] This monetary value includes a May 7, 2014 disbursement for $300,000.00 to replenish the Credit Interest Reserve Account, an August 30, 2014 disbursement of $280,000.00 to replenish the Credit Interest Reserve Account, and $44,234.94 pursuant to an interim payment. JX662.

46

all amounts owed thereunder were to be paid. JX595. The September Modification also granted MRPC the option to request an additional three-month extension. JX595 at 1.

While negotiating the May Modification, Mr. Kneip sent an e-mail to Mr. C. Patel stating the following:

> [w]ith regard to the extension, we can NOT use a portion of the $1.5MM CD. You may recall we needed that as cash collateral to be under our legal lending limit. We need to retain it until the bridge loan is paid off by DelVal (after construction). So replenishing the interest reserve must come from another source.
>
> Interest reserve replenishment should be addressed when you analyze and request an interim loan to finance cost overruns created by the water main break and flood, which should be covered by insurance. Be sure to explain the request to cover change orders in the 504 loan and the new requested loan for FF&E. This needs to be done soon as both Crown Bank Board Loan Committee and DelVal/SBA must approve.

JX385.

Mr. C. Patel testified that he disagreed with Crown treating the $1,500,000.00 as a deposit rather than as cash collateral. TT:8/2, 51:13-15. Mr. C. Patel did acknowledge that the cash collateral, held in a certificate of deposit, was necessary to offset the legal lending limit for Crown. TT:8/2, 83:12-84:10. The Court finds that the $1,500,000 held in MRPC's bank account was cash collateral under the Agreement's Article IV, section 4.14 and that this money was subject to the Security Agreement. JX84 (Art. IV, sec. 4.14).

Despite being reminded again on December 5, 2014 that the CD needed to be held until the "bridge loan is paid off," on or about December 8, 2014, Mr. C. Patel transferred the $1,500,000 cash collateral to MRPC's bank account at TD Bank. JX649; JX650; JX706; JX732. Crown reversed the transfer. The evidence indicates that Mr. C. Patel had an understanding that this was a breach of the Agreement. The Court finds that Mr. C. Patel's testimony at trial demonstrated that he understood that the withdrawal of the $1,500,000 cash collateral would

47

serve as a substantial adverse material change in the borrower's financial strength and constitute a breach of the Loan Documents, as not contemplated under the SBA 504 contract. TT:8/3, 147:10-149:15. Mr. C. Patel memorialized this understanding in an e-mail to Mr. Kneip dated March 7, 2014, stating: "[t]he contractor will not accept to wait for their final payment to come from insurance proceeds. The CDC for the SBA 504 believes also that there could be a substantial adverse material change in borrower's financial strength if the liquidity (the $1.5MM CD) is compromised in any fashion." JX483.

As the January 31, 2015 Loan maturity approached, the parties negotiated toward a further extension and a process that would allow a certificate of occupancy to issue and the SBA Loan to close. On December 22, 2014, Crown sent a wire advance to Real Hospitality Group, on MRPC's behalf, as part of the negotiation process. JX662; TT:11/7, 223:3-15. The disbursement was made after an in-person meeting with Mr. C. Patel, to resolve any issues related to funding. TT:11/7, 223:16-22.

On or about January 6, 2015, the Hotel received its temporary certificate of occupancy. Pre-Tr. Stip. at 13 at ¶24. On or about January 8, 2015, the Hotel received its final certificate of occupancy. Pre-Tr. Stip. at 13 at ¶25. On or about that same date, the Hotel received franchise approvals to open for business and opened for business to the general public. Pre-Tr. Stip. at 13 at ¶26.

Upon receiving its certificates of occupancy, MRPC cut off communication with Crown and initiated the present suit on January 30, 2015. Pre-Tr. Stip. at 13 at ¶27.

The Loan matured on January 31, 2015. MRPC did not close on the SBA Loan. MRPC did not make payment to Crown upon maturity of the Notes.

48

### C. CONCLUSIONS ON CLAIMS OF PLAINTIFFS AND CROWN

#### 1.     Plaintiffs' Claims

#### A.  Count II – Breach of Contract.

After considering all of the evidence and the applicable law, the Court does not find a material breach of contract by MRPC.

As more fully stated above in Section III.B-H, the Plaintiffs must prove, by a preponderance of the evidence, the following to succeed on Count II: (1) a valid contract, (2) breach of that contract, and (3) damages resulting from that breach.  Failure to perform a contract in accordance with its terms and conditions constitutes a breach of contract.  It does not matter if the failure to perform was purposeful or inadvertent.

A breach may be material or minor.  If a breach "goes to the essence of the contract," then the breach is material.  Here, the Court must consider facts that demonstrate:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonably assurances; and

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Whether conduct is a breach of contract or a material breach of contract is ordinarily a question for the trier of fact—the Court.

If a party materially breaches the contract, the other party may treat the contract as void or proceed on the contract. If the non-breaching party continues to perform on the contract, then the contract remains valid. Continuing to perform in the face of a material breach does not deprive the non-breaching party of a right of action for the breach which has already taken place. If the non-breaching party continues to perform, then the non-breaching party is deprived of any excuse for ceasing performance on its own part.

The Court finds that the parties did not modify the Agreement, or any other related loan document, though actions and conduct. Under New Jersey law, the Plaintiffs (most specifically MRPC) and Crown could have modified the Agreement by an explicit agreement, or through the actions and conduct of the Plaintiffs and Crown if the intention to modify is mutual and clear. The parties presented evidence that MRPC and Crown attempted to work together to get the remediation and renovation work done at the Hotel; however, the evidentiary record does not support a conclusion that MRPC and Crown mutually and clearly intended to modify the Agreement through a course of conduct. When the Plaintiffs and Crown intended to modify the Agreement, the evidence demonstrates that the parties negotiated and executed modification agreements—*i.e.*, the May Modification and the September Modification. JX531; JX595.

The Plaintiffs rely too heavily on what happened in the first few months after the Sprinkler Incident to demonstrate that Crown and MRPC modified the Agreement though a course of conduct. BCD sent a delay notification to MRPC. MRPC forwarded that delay notification to Crown. Crown responded and stated that "at this time [Crown] will not consider a construction loan extension, however as the job proceeds and we get closer to completion, [Crown] will of course consider an extension (which must be approved by DelVal as well) at that time." MRPC and BCD agreed to address the Sprinkle Incident through construction change

50

orders. Crown did not indicate that Crown agreed to a change in Article IV, or any other part, of the Agreement. Crown, as a lender, did work with MRPC and BCD with respect to the Sprinkler Incident.

The Plaintiffs attempted, during the Trial and afterwards, to disparage the efforts of Crown's personnel to address the Sprinkler Incident and its ramifications, and Crown's work with BCD and MRPC. MRPC argues that these efforts demonstrate that Crown and MRPC modified the Agreement through a course of conduct. The Court, as fact finder, is unimpressed by the Plaintiffs' attempts. The Court viewed the conduct of Crown to be reasonable under the circumstances and not a manifested intent to modify the Agreement. As the Agreement expressly provides, Crown is not MRPC's partner. JX84, Art. VIII, sec. 8.1(i). Moreover, unless there is default, Crown does not control construction at the Hotel. JX84, Art. VII, sec. 7.5(a)-(e). Crown is the lender in this transaction. Crown, however, did have a responsibility in certain circumstances to act reasonably and in good faith. JX84, Art. VIII, sec. 8.1(a). Instead of viewing Crown's efforts to work with MRPC as modifying the Agreement or actions taken in bad faith, the Court finds those actions to be reasonable in light of the serious nature of the Sprinkler Incident.

The Sprinkler Incident was MRPC's issue and MRPC's responsibility. BCD took steps to protect its role and MRPC and BCD modified the AIA. The Agreement provided flexibility without modification to its terms and conditions to address change orders and alike. Crown responded to MRPC's request by stating that it would not, at that time, agree to a modification of the Agreement. The Court finds for these reasons that Crown never mutually and clearly intended to modify the Agreement through a course of conduct. When Crown wanted to modify

51

the Agreement, Crown entered into written modifications signed by all the necessary parties—*i.e.*, the May Modification and the September Modification.

The Court does find that Crown breached the timing requirements on funding. The Loan Commitment and the Agreement talk in terms of Crown funding Draw Request within five (5) business days of approval by the Bank. JX84, Art. IV, sec. 4.1(c); JX23, Exhibit "E;" JX79, Exhibit "E." The Court does not find that either party succeeded in explaining what a "satisfactory CONSTRUCTION MANAGER" meant—whether it was Mr. Mirandi's site inspection or the process described by Mr. Rodrigues. The Court does not believe that this matters. The evidence at Trial demonstrates that Crown did not, on a number of occasions, fund within five (5) business days after: (i) Mr. Mirandi submitted an inspection report; or (ii) execution of the Construction Loan Advance Authorization Sheet.

The Court finds that Crown breached Article IV, section 4.14 of the Agreement. The Agreement provides that MRPC was to fund a Certificate of Deposit at Crown in the amount of $1,500,000 as cash collateral. Instead, MRPC funded the $1,500,000 and Crown put it in a money market account.

The Court finds that Crown breached Article IV, section 4.1(a) of the Agreement because Crown did not provide a "standard form draw request."

The Court finds that Crown breached other parts of Article IV during the renovation of the Hotel.

The Court finds that Crown breached Article VI, section 6.2 because Crown made advance proportionally under both the Permanent Note and the Interim Note.

The Court does not find that any one of these breaches constitutes a material breach of the Agreement, or any other related agreement. Arguably, only Crown's failure to fund all of

52

the Draw Requests within five (5) business days of Mr. Mirandi submitting an inspection report or execution of the Construction Loan Advance Authorization Sheet could possibly constitute a material breach. The Court finds that the other breaches in no way go to the very essence of the Agreement. For example, the use of a money market account instead of a certificate of deposit does not go to the very essence of the Agreement which is a construction loan agreement. Moreover, the Court does not find that the Plaintiffs demonstrated how Crown's breach of Article VI, section 6.2 of the Agreement deprived MRPC of the benefit of the Agreement. The Court does not find that Crown's legal lending limit was a source of any breach of the Agreement.

As for the Draw Requests and Crown's breach of the five day requirements, the Court does not find that the Plaintiffs proved by a preponderance of the evidence that Crown's failure to pay every Draw Request, in the amount requested by MRPC, within five (5) business constitutes a material breach. The Court heard the testimony of Mr. C. Patel, Mr. Mirandi and others as to the various Draw Requests. The Court finds that Mr. Mirandi's testimony on the amounts approved were credible and valid. Moreover, in certain circumstances, Crown disbursed more than what Mr. Mirandi approved in his site inspection report. *See, e.g.*, Draw Requests #6 and #11.

More importantly, Crown only failed to disburse on a Draw Request within thirty (30) days of the Draw Request twice and never over thirty (30) days from the date of an inspection report. The Agreement expressly provides that disbursement shall not be made more than one time per month. JX84, Art. IV, section 4.1(c). The Court does not find that failing to fund within five (5) business days under the circumstances constitutes a material breach going to the very essence of the Agreement. Moreover, while MRPC and BCD complained of the timing of

the Draw Requests, MRPC never communicated to Crown that MRPC felt Crown was in default (material or non-material) under the Agreement. While the Agreement does not require any written notice, the Court, as fact finder, took note of the absence of any such communication prior to the filing of this civil action by way of the Complaint.

The Court does not find that the evidence supports the Plaintiffs' damage argument. By seeking $12,188,089.89 in damages for Crown's breaches, the Plaintiffs are essentially arguing that Crown's non-material breaches warrant forfeiture. Under the Agreement, the evidence demonstrates that Crown advanced $12,754,322.09 in funds to MRPC. In addition, the evidence shows that the Hotel was successful renovated and opened. Despite this, MRPC is contending that Crown so materially breached the Agreement in various ways that Crown is not entitled to anything but a very modest return (under $500,000) for funding the purchase of the Hotel and approximately $7,800,000 in construction costs. The Court finds that Plaintiffs failed to adduce evidence that demonstrates, by a preponderance of the evidence, any of Crown's non-material breaches support such a damage claim.

The Court also does not find that the Plaintiffs proved damages with a reasonable degree of certainty. The Court, as discussed in Section III.C.1.A, does not find that Crown is—as the Plaintiffs characterize Crown—a "wrongdoer." In addition, the Court does not find that a number of underlying assumptions, about funding (timing and amount) and prospective profits, of the Plaintiffs' damage claim are supported by the evidence. To come to the $12,188,089.89 amount, the Court would need to disregard all of the testimony of Mr. Mirandi and Mr. Kniep and find credible the testimony of Mr. C. Patel, Mr. Santora and Mr. Lesser on damages. The Court, for reasons discussed above, cannot do that as the Court finds, after observing their

54

testimony, Mr. Mirandi and Mr. Kneip to be credible witnesses and Mr. C. Patel not to be a credible witness.

The Court may have entertained a lesser amount for the various non-material breaches, but the Plaintiffs did not provide such evidence.

### B. Plaintiffs' Count III – Breach of Covenant of Good Faith and Fair Dealing

After considering all of the evidence and the applicable law, the Court does not find that Crown breach the covenant of good faith and fair dealing.

As set forth above, New Jersey does recognize a claim for the breach of the covenant of good faith and fair dealing. In order for there to be a breach of the implied covenant of good faith and fair dealing in this case, the Plaintiffs must demonstrate that Crown, with no legitimate purpose: 1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and 2) by such conduct, denied the party of the bargain initially intended by the parties.

In considering what constitutes bad faith, a number of factors can be considered, including the expectations of the parties and the purposes for which the contract was made. The fact finder should also consider the level of sophistication between the parties, whether the parties had equal or unequal bargaining power, and whether the party's act involved the exercise of discretion. The Court, as the fact finder, must keep in mind, however, that bad faith is not established by simply showing that a party's motive for the actions did not consider the best interests of the other party. New Jersey contract law does not require parties to behave thoughtfully, charitably or unselfishly toward each other.

In order for a party to prevail on a breach of implied covenant of good faith and fair dealing, the fact finder must specifically find that bad faith motivated a party's actions. A party

55

who acts in good faith on an honest, but mistaken, belief that the actions were justified has not breached the covenant of good faith and fair dealing.

The Plaintiffs contend that Crown failed to: (i) negotiate the May Modification in good faith; (ii) keep regular and ordinary accounting of all funds; and (iii) partner with another lender when additional funds were needed after Crown went up to its legal lending limit. The Court took in evidence on all of these issues. As the finder of fact, the Court cannot conclude that Crown acted with bad motives or intentions or engaged in deception or evasion in the performance of contract and denied the Plaintiffs the bargain initially intended by the parties.

At the time of the May Modification, the improvements at the Hotel were, by everyone's testimony, not complete. The May Modification did not provide Crown with additional collateral. The May Modification extended the maturity date of the Notes to October 31, 2014 after payment of an extension fee, modification fee and plan and cost fee. The May Modification required a final general contractor contract not to exceed $9,326,559.62 (in reality this number grew to $9,550,000), replenishment of the Interest Reserve with $100,000 from loan proceeds and change the prepayment penalty.

MRPC, and the various guarantors, borrowers and alike, signed the May Modification. Crown, after approval by the BLC, signed the May Modification.

The Court does not find that this negotiation and the terms of the May Modification were motivated by bad faith on the part of Crown. The testimony and exhibits demonstrated a logical business negotiation based on the situation presented in the Spring of 2014.

In addition, the Court does not find that Crown's way of regularly and ordinarily accounting records of all funds demonstrates the type of bad faith intent necessary to support the claim made in Count III. Whether another bank or lending institution would have kept records

56

differently does not demonstrate that Crown's record keeping method with respect to the Loan demonstrated bad faith or intentions. The Plaintiffs failed to demonstrate at the Trial that Crown or anyone at Crown maintained Crown's accounting records in a manner (whether with ill will or good will) to disadvantage MRPC.

As for the final contention regarding legal lending limits and partnering with another lender, the Plaintiffs have failed to carry their burden of proof in demonstrating to the Court how this demonstrates that Crown violated the covenant of good faith and fair dealing. Throughout the Trial, the Plaintiffs tried to demonstrate that Crown's legal lending limit restricted Crown's obligations under the Loan. The Plaintiffs argue that Crown acted unreasonably at the outset of the Loan by extending its entire legal lending limit and tying up all of the Plaintiffs' collateral and that this prevented another lender from coming in to assist the funding of construction costs.

The Court finds this contention to be "far-fetched." The Plaintiffs needed the Loan. The Plaintiffs found Crown. The Plaintiffs, in an arms-length negotiation, agreed to the collateral package. The Court just cannot find that Crown's action at the very outset of the Loan with respect to the collateral package or the terms of the Loan Commitment and the Agreement were so unreasonable as to constitute bad faith or ill intent.

In fact, the Court is at a loss even now as to what is Crown's ill intent towards the Plaintiffs. Crown is a bank and as a bank must protect the Loan. Mostly due to the Sprinkler Incident, the project ran into difficulty. The Agreement expressly provides that Crown and MRPC are not partners. For the most part, Crown acted reasonably when MRPC made requests to address issues caused by the Sprinkler Incident. The Court finds that Crown's conduct, while not perfect, from December 19, 2012 through January 31, 2015 was reasonable, explainable and not done in bad faith or with improper intentions.

57

**2.** **Crown's Counterclaims**

The Court finds that Crown has carried its burden of proof with respect to the Counterclaims.

The Court has already stated the standard for breach of contract, including what constitutes a material breach, under New Jersey law. *See* Section III.B-H.

**A. Counterclaims I and II—Money Damages—Note #1 and Note #2**

The Court finds that the evidence adduced during the Trial proves by a preponderance of the evidence that MRPC breached its obligations under the Agreement and the Notes. There has been no challenge to the validity of the Agreement or Notes. The Court holds that the Agreement and the Notes are valid contracts under New Jersey law.

As discussed above, the Court did not find that Crown committed a material breach of the Agreement or the Notes such that MRPC is excused from performance under these contracts.

The Court finds that Crown established that MRPC committed numerous material breaches of the Loan Documents. First, MRPC breached the Agreement in December of 2014 when Mr. C. Patel transferred the $1,500,000 in cash collateral from an account at Crown to an account at TD Bank. Article IV, section 4.14 of the Agreement states that the cash collateral must remain with Crown "until the Interim Note is paid in full." JX84 at 9. The Interim Note had not been paid in full at the time MRPC transferred the cash collateral.

The Court also finds that MRPC breached the Permanent Note and Interim Note by failing to make payments to Crown upon maturity of the Notes. The Permanent Note required payments of principal and interest in accordance with the payment schedule set forth in the Permanent Note, *i.e.*, monthly payments due and owing on the second (2nd) day of each

consecutive month commencing on January 31, 2015. JX85 at 2; JX595. MRPC has failed to make the required payments under the Permanent Note.

The Court finds that MRPC's breach of the Permanent Note has caused Crown damages in the sum of $7,640,000.00, plus interest, penalties, late charges, costs and attorney's fees as defined under the Permanent Note.

MRPC was obligated under the Interim Note to pay the "entire unpaid principal balance and all accrued and unpaid interest…upon the funding of the SBA Loan…and in no event at a date later than [January 31, 2015]." JX134 at 1; JX595. Article VII, section 7.1(n) of the Agreement provides that a failure to close the SBA Loan on or before the Maturity Date is a default. JX84 at 14. The evidence produced at the Trial demonstrates that the SBA Loan was not funded by January 31, 2015. Crown demonstrated that MRPC has failed to make the required payment under the Interim Note or cure its default.

The Court finds that Crown has incurred damages in the sum of $5,348,000.00, plus interest, late charges, costs and attorney's fees as defined under the Interim Note.

## B. Counterclaims III Through XVI—Breach of Contract: Guaranty Agreements

The Court finds that the Guaranty Agreements are valid contracts. The plain terms of the Guaranty Agreements, executed by the Guarantors, set forth an unconditional guarantee of payment of all amounts owed to Crown by MRPC under the Permanent Note and Interim Note as well as all costs incurred by Crown. The Guaranty Agreements provide that the Guarantors make payment to Crown should MRPC fail to pay all of the amounts owed under both Notes on or before January 31, 2015. Moreover, the Guarantees of Payment state that the respective guarantees cover all obligations and liabilities incurred by MRPC "in any capacity," to include

"interest and all reasonable fees, costs, expenses, attorneys' fees and other costs of collection incurred or paid by Crown." Guarantees of Payment at 1 (*see* fn 41 *supra*).

The Guaranty Agreements provide that the Guarantors had an obligation to make payment of the principal and any and all interest, costs, and fees as set forth therein, to Crown under the plain contractual provisions set forth in the Permanent Note and Interim Note, on or before January 31, 2015. The evidence at the Trial demonstrates that all Guarantors knew they were unconditionally guaranteeing amounts owed to Crown. TT:8/1, 75:18-78:4 (C. Patel). The Guarantors have failed to make payment to Crown under the Notes. Under the terms of the Guaranty Agreements, the Guarantors are in breach of contract.

### C. Counterclaims XVII and XVIII—Judgment In Possession as to Security Agreements

The Court finds that Crown had demonstrated by a preponderance of the evidence that MRPC has breached the Security Agreements. Section 4.1(a) of the Security Agreements provides that a "default of any liability, obligation, covenant or undertaking of MRPC owed to Crown, under the Notes or any other Loan Documents, including the failure to pay in full and when due any installment of principal or interest or default of MRPC under any other Loan Document or any other agreement" constitutes a breach of the Security Agreements. JX89 at 6. Moreover, Section 4.2 contains an acceleration clause which dictates that upon default any and all obligations owed to Crown are immediately due and payable. JX89 at 7.

The Security Agreements provide that, upon breach, Crown is entitled to take possession of the Collateral as identified in the Security Agreements in a commercially reasonable manner. Consequently, Crown is entitled to possession of the Collateral, to include MRPC's accounts, equipment, and inventory.

### D.  Counterclaim XIX—In Rem Levy on the Hotel

As set forth herein, MRPC executed the Notes, as well as the MRPC Mortgages in support of the Notes.  JX85; JX135.  The Permanent Note Mortgage in support of the Permanent Note was recorded and became a first position lien upon the Property.  JX86.  The Interim Note Mortgage in support of the Interim Note was recorded and became a second position lien on the Property.  JX135.  Given MRPC's default, as set forth above, MRPC owes Crown $7,640,000.00 under the Permanent Note, exclusive of interest, late charges, penalties, attorneys' fees and costs, and $5,348,000.00 under the Interim Note, exclusive of interest, late charges, penalties, attorneys' fees and costs.  The Court finds that Crown is entitled to exercise its various rights under the MRPC Mortgages.

### E.  Counterclaim XX—In Rem Levy on the Country Inn Hotel

Krishnas executed and delivered its particular Guaranty Mortgage in support of the Notes.  This Guaranty Mortgage recorded under the Permanent Note became a third position lien upon the Country Inn Hotel and the Interim Note became a fourth position lien upon the Country Inn Hotel.  JX96: JX142.

MRPC has defaulted in payment of the Notes.  Pursuant to the Guaranty Mortgages, the Court finds that Crown is entitled to exercise its various rights under Krishnas' Guaranty Mortgage as to the Country Inn Hotel.

### F.  Counterclaim XXI—In Rem Levy on the Patel Residence

Mr. P. Patel and Ms. R. Patel executed and delivered their Guaranty Mortgage in support of the Notes.  This Guaranty Mortgage recorded under the Note became a third position lien upon the Patel Residence, and the Guaranty Interim Note became a fourth position lien upon the Patel Residence. JX118, 121, 159, 160.

MRPC has defaulted in payment of the Notes. Pursuant to the Guaranty Mortgages, the Court finds that Crown is entitled to exercise its various rights under the Guaranty Mortgage of Mr. P. Patel and Ms. R. Patel as to the Patel Residence.

### G. Damages

Crown seeks a money judgment in its favor against all Plaintiffs in the principal sum of $12,998,000.00 plus: (1) pre judgment interest at the per diem rate of $4,329.34 from April 14, 2015 through the date of judgment; (2) post judgment interest at the per diem rate of $4,329.34; (3) prepayment penalties in the amount of $1,299,800.00, (4) late charges of $12,505.39, and (5) attorneys' fees and costs in a yet to be determined amount.

### i. Monetary Relief Against MRPC

### —Loan Principal

The Court finds that due to MRPC's contractual breaches of the Loan Documents, Crown is entitled to a money judgment in the principal sum of $12,988,000.00. As of December 22, 2014, Crown had advanced $12,754,322.09 in funds to MRPC, holding back only retainage as permitted under Section 4.1(f) of the Agreement. JX662. In late December 2014, as the parties were negotiating a possible solution to complete the project and fund remaining change orders, the amount remaining available to pay retainage under the Loan was $233,677.91. JX662. On January 30, 2015, MRPC initiated the instant litigation against Crown, contemporaneously cutting off communication between the parties. Beyond that point, no further loan advances were made by Crown to MRPC, nor were any requested by MRPC. Subsequently, interest continued to accrue on a daily basis thereby reducing available Loan proceeds. By April 13, 2015, the accumulation of daily interest exceeded the $233,677.91 amount available under the

Loan. After April 13, 2015, interest began accruing, at a rate calculable per diem, on the principal balance of $12,988,000.00.

Crown is entitled to judgment in its favor under the plain, unambiguous language of the Loan Documents. As set forth in Section 7.2 of the Agreement a default thereunder "shall constitute a default under each of the Loan Documents." JX84 at 14. Moreover, under Section 7.3 of the Loan Agreement, upon MRPC's default, Crown is entitled to declare the Loan and all sums owing to Crown under the Agreement "due and payable" without exception. JX84 at 14.

### —Interest and Penalties Under the Notes

The Court finds that due to MRPC's breaches of the Loan Documents, Crown has been subjected to significant economic loss and risks being unable to be made whole through the sale of its collateral. Accordingly, the Court should award unto Crown all interest, fees and penalties that were contractually agreed upon in the Loan Documents.

The Notes both bore interest at a minimal rate of seven percent (7%). JX85 at 2; JX134 at 1. Upon an Event of Default, the interest rate increases by five percent (5%), resulting in a default rate of twelve percent (12%). JX 85 at 3; JX 134 at 2. Upon breach by MRPC in December of 2014, Crown began to assess the default rate of twelve percent (12%). JX 754; TT:10/7, 226:8-12 (Rodrigues). During the time period of December 3, 2014 through April 13, 2015, the Permanent Note accrued interest in the amount of $334,568.72, or $2,534.61 per diem, and the Interim Note accrued interest in the amount of $226,621.45, or $1,716.83 per diem. As of April 13, 2015, the accruing interest exceeded the principal Loan amount. TT:10/7, 226:13-227:16 (Rodrigues). After April 13, 2015, the Permanent Note and Interim Note accrued interest at the rate of $2,546.67 per diem and $1,782.67 per diem, respectively. JX 754

Both Notes are also subject to a prepayment penalty. JX85 at 2; JX531 at ¶10. Pursuant to the terms of the May Modification the prepayment penalty percentage was increased from two percent (2%) to ten percent (10%). JX531 at ¶10; TT:10/7, 227:17-228 (Rodrigues). Consequently, when the Notes are paid, a prepayment penalty of $1,298,800.00 will be due and owing.

Additionally, both Notes provide for a late charge of five percent (5%) as liquidated damages on any amount not paid within 10 days. JX85 at 2; JX134 at 1. The amount of late charges accrued on the Loan before default total $12,505.39, consisting $8,294.16 from the Permanent Note and $4,211.23 from the Interim Note. JX754

### ii. Judgment Against Guarantors

The plain language contained in Guaranty Agreements guaranties unto Crown the "prompt payment, when due, whether by maturity, acceleration or otherwise, of all present or future obligations or liabilities of the Borrower to the Bank, whether now existing or arising after the date of this Guaranty … together with all modifications, extensions, or renewals of the obligations or liabilities." Guarantees of Payment at 1. The Guarantees of Payment cover obligations and liabilities incurred by MRPC in any capacity. Guarantees of Payment at 1. Therefore, the Court finds that the damages due to the breach of the Guaranty Agreements by the Guarantors is in the same amount as the monetary relief against MRPC.

### iii. Additional Relief

Crown asks for specific declarations regarding foreclosures, assignments, etc. The Court will not provide specific judgments or declarations on these requests. Instead, the Court concludes and holds that Crown is entitled to exercise its rights (i.e., foreclosure, assignment,

etc.) in accordance with the terms of the Agreement, the Notes, the Security Agreement, the Guaranty Agreements, the Mortgages, and the Assignment of Leases and Rents.

### iv. Attorneys' Fees

Pursuant to the Loan Documents, as set forth in detail above, Crown is entitled to receive attorneys' fees for its successful prosecution of the Counterclaims. Specifically, the Notes provide that "the Borrower shall pay all cost of collection of any and all sums due and owing hereunder and not paid, including without limitation court costs and reasonable attorneys' fees in connection with the collection of any sums." JX85 at 3; JX134 at 2. Moreover, the Guarantees of Agreement cover all obligations and liabilities incurred by MRPC in any capacity; these obligations and liabilities explicitly include "interest and all reasonable fees, costs, expenses, attorneys' fees and other costs of collection incurred or paid by [Crown]." Guarantees of Payment at 1.

The broadest language governing attorneys' fees is found in the MRPC Mortgages and Guaranty Mortgages, specifically mandating that the Mortgagor, MRPC or the Guarantors, shall reimburse Mortgagee, or Crown, for all reasonable costs and counsel fees incurred "[i]f Mortgagee employs an attorney to collect any of the indebtedness or to enforce performance of the obligations, covenants and agreements secured hereby, or to advise Mortgagee with respect to its rights and remedies hereunder and under the Note in case of an Event of Default or threatened Event of Default." JX86 at 7; JX135 at 7; Guaranty Mortgages at 7-8. With respect to supplemental litigation, Crown is involved in litigation with MRPC in New Jersey and Maryland, as well, pertaining to disputes arising out of the Loan Documents. TT:10/7, 229:17-230:12.

Crown Bank is directed to submit an affidavit detailing those costs within thirty (30) days

from the date of this Decision after Trial.

Dated: December 26, 2017
Wilmington, Delaware

                         /s/Eric M. Davis
                         Eric M. Davis, Judge